132 591
139 459

# COMMONWEALTH v. NEW YORK ETC. R. CO. ET AL.

APPEAL BY PLAINTIFF FROM THE COURT OF COMMON PLEAS
OF ELK COUNTY.

Argued January 27, 1888.
Re-argued May 6, 1889—Decided March 3, 1890.
[To be reported.]

1. As § 5, article XVII. of the constitution, prohibiting common carriers from engaging in mining, etc., or in any other business than that of common carriers, and from holding lands not necessary for their business, affixes no penalty for its violation, lands held in violation thereof are not liable to escheat, although the franchises of the offending company may be forfeited therefor.

(*a*) The act of April 26, 1855, P. L. 329, prohibits the acquisition or holding by a corporation of any real estate, either directly, or through a trustee or other device whatsoever, unless specially authorized by the laws of the commonwealth, and enacts that all property acquired or held in violation of the prohibition shall be escheated to the commonwealth by proceedings under quo warranto:

2. Said act does not authorize an escheat of lands held and used by a common carrier for the purpose of carrying on the business of mining coal for transportation over its works, for the violation of § 5, article XVII. of the constitution: the escheat which it provides for can be enforced only for the reason that an acquisition or holding of the lands is in violation of the prohibition of the act.

3. In order to escheat land, under said act of 1855, upon the ground that it is held by a foreign railway corporation, without a license so to do from the commonwealth, it must appear that such corporation has either the legal or equitable title to the land itself; otherwise, no escheat can be declared, although such corporation may control the land, through its ownership of the stock of another corporation holding the title by authority of law.

(*b*) A foreign railway company, having no license to hold mineral lands in this state, caused its president to purchase such lands by an agreement in his own name, furnishing to him the money required for a hand payment made on the contract: it then purchased the charter of a Pennsylvania mining corporation, authorized to hold such lands, and retained all its capital stock, except a few shares to qualify directors.

(*c*) The contract for the purchase of said lands was thereupon assigned to said mining company, which subsequently received from the vendor a conveyance of the legal title: the mining company afterward acquired the stock of another mining company, and conveyed the lands to the latter. A proceeding to escheat the lands was commenced in 1884, after these conveyances were made:

Statement of Facts.

4. In such case, when the facts are undisputed, the court should declare their effect as matter of law : the holding by the carrier company of the stock of the mining company was authorized by the act of April 15, 1869, P. L. 31 ; the transaction did not constitute an unlawful " device " within the meaning of § 5, act of April 26, 1855, P. L. 329 ; and, in any event, the act of April 8, 1881, P. L. 9, was a bar to the proceeding : Commonwealth v. N. Y. etc. R. Co., 114 Pa. 340, overruled.

Argued before GORDON, C. J., PAXSON, STERRETT, GREEN, CLARK and WILLIAMS, JJ.

Re-argued before PAXSON, C. J., STERRETT, GREEN, CLARK, WILLIAMS, McCOLLUM and MITCHELL, JJ.

No. 243 January Term 1887, Sup. Ct. ; court below, No. 53 May Term 1884, C. P.

On March 10, 1884, Mr. Lewis C. Cassidy, Attorney General, exhibited in the court below, on behalf of the commonwealth, an information and prayer for a writ of quo warranto against the New York, Lake Erie & Western Railroad Company, with notice to the Northwestern Mining & Exchange Company of Erie, Pennsylvania, and the New York, Lake Erie & Western Coal & Railroad Company, to escheat certain lands in Elk county alleged to have become forfeited to the commonwealth by reason of the fact that the same had been acquired by the first named company, a corporation of the state of New York, in violation of the laws of Pennsylvania, and in like violation were held by it under cover of the charters of the two other corporations above named, and also by reason of the fact that said first named corporation was a common carrier, and said lands were not necessary for its business as such and in violation of the constitution of Pennsylvania were used by it in carrying on the business of mining coal in Pennsylvania for transportation over its works. A writ of quo warranto was thereupon allowed and issued in accordance with the prayer in the information. Issue.

At the trial on May 27, 1885, the commonwealth presented testimony tending to establish the following facts :

In the year 1873, Peter H. Watson was the president of the Erie Railway Co., a New York corporation maintaining and owning a line of railroad extending from Jersey City, N. J., to Dunkirk, N. Y. On July 19, 1873, Mr. Watson entered

into an article of agreement, in his own name, with Charles R. Earley, by which Earley agreed to convey to Watson certain coal lands situated in Elk and Jefferson counties, and to obtain from Isaac P. Martin a conveyance to Watson of certain other lands in Elk county, known as the Daguscahonda lands. On that day Watson paid to Earley the sum of $25,000, on account of the consideration money payable under the contract. The purchase was made by Watson for the benefit of the Erie Railway Co., and the $25,000 was paid to Earley by the check of that company. Earley procured from Martin a deed to Watson dated August 19, 1873, for the Daguscahonda lands.

It having been learned that the Erie Railway Co. could not legally hold lands in Pennsylvania, either directly or in the name of a trustee, Earley, in November, 1873, purchased for the Erie Railway Co., the charter of the Northwestern Mining & Exchange Company, a corporation chartered by the act of March 15, 1872, P. L. (1873) 1021, which at that time had no property except its franchises. A few days afterward, Watson conveyed the Daguscahonda lands to the Northwestern Mining & Exchange Co. and assigned to it his contract with Earley ; and on July 13, 1874, Earley conveyed to the mining and exchange company the legal title to the lands which by the contract of July 19, 1873, he had agreed to convey to Watson. The payments of purchase money subsequent to that of $25,000 above mentioned, were made, at least in part, upon drafts drawn by the Northwestern Mining & Exchange Co. upon the Erie Railway Co. and accepted by the latter. The actual moneys paid came from the treasury of the Erie Railway Co., but they were receipted for to the Northwestern Mining & Exchange Co. At some time, subsequent to the purchase of the charter of the mining and exchange company, its entire capital stock, except the shares required to qualify its directors, was issued to the Erie Railway Co. which was the beneficial owner of the entire stock.

In 1878 the franchises and property of the Erie Railway Company were sold under a proceeding in one of the courts of New York to foreclose a certain mortgage, and became vested in the New York, Lake Erie & Western Railroad Co.,

which has since been the owner of the capital stock of the Northwestern Mining & Exchange Co.

In 1881, the Northwestern Mining & Exchange Co. acquired the capital stock of the Wilcox & Howard Hill Improve ment Co., a corporation chartered by the act of April 8, 1870, P. L. (1871) 1501, the purpose of this acquisition being to build a line of railroad connecting the lands aforesaid with the road of the New York, Lake Erie & Western Railroad Co. For the purpose of legalizing the issue of the stock of the improvement company, the mining and exchange company conveyed to it, inter alia, the lands in question in this case. Afterward the name of the improvement company was changed by a decree of the Court of Common Pleas of McKean county to the New York, Lake Erie & Western Coal & Railroad Co. All of its stock except the "qualifying shares" standing in the name of its directors, was held by the Northwestern Mining & Exchange Co. A railroad connecting the lands in question with the road of the New York, Lake Erie & Western Railroad Co., was constructed, and coal mined from said lands was transported to market over said company's lines.

The commonwealth having rested, the defendants offered in evidence the act of February 16, 1841, P. L. 28; Sections 2 and 3, act of March 26, 1846, P. L. 179; Act of March 22, 1860, P. L. 223; Section 1, act of April 1, 1848, P. L. 330.

The testimony being closed, the court, MAYER, P. J., instructed the jury to render a verdict in favor of the defendants; verdict accordingly.

Subsequently the court, MAYER, P. J., delivered the following opinion, whether upon a motion for a new trial or not, did not appear in the paper-books:

This is a proceeding instituted by the commonwealth to escheat or forfeit certain lands situate in this county, which, it is claimed, are held by the New York, Lake Erie & Western Railroad Co., a foreign corporation, in violation of the constitution and laws of this state.

The facts in the case are not disputed, and it becomes our duty to declare the legal effect of them. The contention being practically one of law, and not of fact, we directed the jury to find a verdict for the defendant, being of the opinion

that neither under the act of assembly of April 26, 1855, P. L. 329, nor § 5, article XVII. of the constitution, are the lands liable to escheat.

It is undisputed that the New York, Lake Erie & Western Railroad Co. is a corporation of the state of New York, owning and operating a line of railroad extending from Jersey City, in New Jersey, to Dunkirk, in New York, and is engaged in the business of a common carrier on said road. That the Northwestern Mining & Exchange Co. is a corporation of the state of Pennsylvania, authorized by its charter to own and hold lands in this state, and to mine and sell coal therefrom. That in November, 1873, the New York, Lake Erie & Western Railroad Co. acquired all the capital stock of the Northwestern Mining & Exchange Co. and since that time has and does yet own, hold, and control said stock. That in July, 1874, Charles R. Earley and wife conveyed to said Northwestern Mining & Exchange Co., the lands situate in Elk county, which it is claimed had previously been purchased in the name of Charles R. Earley, for the use and benefit of the said railroad company.

It is contended on the part of the commonwealth, that as the defendant railroad company was a foreign corporation, it could not acquire any title to said lands without an express grant from the state, and that the acquisition and purchase of said lands was contrary to the express prohibition of the laws of the commonwealth, by reason whereof said lands became escheated. It is claimed that the acquisition and holding of said lands was in violation of the act of assembly of April 26, 1855, which declares in the fifth section " that no corporation other than such as shall have been incorporated under the laws of this state, nor shall any foreign government, potentate or power, hereafter acquire and hold any real estate within this commonwealth directly in the corporate name, or by or through any trustee or other device whatsoever, unless specially authorized to hold such property by the laws of this commonwealth." Section 9 provides: " That all property hereafter acquired and held by persons, corporations, or associations, forbidden by this act to hold the same, or held contrary to the intent of this act, and all such hereafter acquired and held beyond the limit prescribed as aforesaid by this act, shall escheat to this commonwealth, and upon the same being adjudged to have escheated

Opinion of Court below.

under proceedings in court by quo warranto in all respects as is provided by law in the case of the usurpation of any corporate franchise, the same shall be taken in possession and disposed of, and with the like compensation to the person or persons informing and procuring the inquisition as in cases of property escheated for defect of heirs."

It is further contended that as the said railroad company is engaged in the business of a common carrier, that the acquisition and holding of the stock of the Northwestern Mining & Exchange Co. is in effect the owning of the lands of the latter company, and that the ownership of said lands and the mining of coal therefrom are not necessary for its business as such common carrier. That such ownership and business are prohibited by § 5, article XVII. of the constitution of this state, which declares that " no incorporated company doing the business of a common carrier shall, directly or indirectly, prosecute or engage in mining or manufacturing articles for transportation over its works; nor shall such company, directly or indirectly, engage in any other business than that of common carriers, or hold or acquire lands, freehold or leasehold, directly or indirectly, except such as shall be necessary for carrying on its business; but any mining or manufacturing company may carry the products of its mines and manufactories on its railroad or canal, not exceeding fifty miles in length." Section 12 of the same article of the constitution provides that " the general assembly shall enforce, by appropriate legislation, the provisions of this article."

Conceding that the holding of land by the New York, Lake Erie & Western Railroad Co. is prohibited by the constitution of the state, it does not follow that the land can be escheated. We are of the opinion that as the constitution has not provided for any escheat or forfeiture of lands, acquired and held in violation of § 5, article XVII., none can be declared. It was evidently intended by the framers of the constitution of 1874, that the " general assembly should by appropriate legislation enforce the provisions " of the fifth section of the seventeenth article, by prescribing what penalties should be incurred for its violation. The general assembly has failed to pass such legislation, and until they do the courts cannot enforce this section in this mode of proceeding. The commonwealth may

have a remedy by a proceeding to forfeit the charter of a corporation acquiring or holding lands in violation of this section, but it cannot escheat the lands.

But it is argued that under the provisions of this act of assembly of April 26, 1855, the lands can be escheated, under proceedings instituted under this act. While it is true that the fifth section of said act prohibits any foreign corporation from acquiring and holding real estate within the commonwealth, either directly in its corporate name, or by or through any trustee or other device whatever, and the ninth section provides the penalty for such acquiring and holding, viz., by escheating the lands, yet the third section of the act, in express terms, declares that the shares held by shareholders in mining and manufacturing companies shall be taken to be personal property, conferring a right to receive dividends of the profits and proceeds of the real estate held by such companies, but not to create any title in the shareholders in and to such real estate. Here is a legislative declaration that the ownership of the stocks of a mining or manufacturing company does not constitute the holding of lands under this act, and therefore does not come within its prohibition. Besides, the act of April 15, 1869, P. L. 31, makes it lawful for railroad and canal companies to aid corporations authorized by law to develop the coal, iron, lumber, or other material interests of this commonwealth, by the purchase of their capital stock and bonds, or either of them. The words of this statute are plain and of easy interpretation, and the courts should not give such a construction to them as would destroy existing rights. This act prescribes no limitation or restriction as to the amount of capital stock a railroad company may purchase.

And it may be worthy of consideration whether the act of 1869 is not in effect a modification or repeal of the act of 1855, and whether the purchase of the stock of the Northwestern Mining & Exchange Co. by the New York, Lake Erie & Western Railroad Co. may not be upheld under this act.

Judgment having been entered upon the verdict, the commonwealth took this appeal, specifying, inter alia, that the court erred:

7. In directing a verdict for the defendants.

The cause was argued in this court on January 27, 1888, by *Mr. Silas W. Pettit* for the appellant, and *Mr. John G. Hall* and *Mr. George W. Biddle,* for the appellees, and on February 25, 1888, a re-argument was ordered per curiam.

*Mr. Silas W. Pettit* (with him *Mr. Wm. S. Kirkpatrick,* Attorney General, *Mr. John F. Sanderson,* Deputy Attorney General, *Mr. John R. Read, Mr. George A. Jenks* and *Mr. William P. Jenks*), for the appellant:

1. The only difference between the facts of this case and those in Commonwealth v. New York etc. R. Co., 114 Pa. 340, is that the title to the lands involved in that case still remains in the Northwestern Mining & Exchange Co., while in the present one the lands were conveyed by it to the New York, Lake Erie & Western Coal & Railroad Co., formerly the Wilcox & Howard Hill Improvement Co. The introduction of this additional link in the chain of title can make no difference in the result between the two cases. There can be no doubt, because it is shown by uncontradicted testimony, that the New York, Lake Erie & Western Railroad Co. has practically, and for every substantial purpose, the real ownership of the lands here in question. The first question raised by this record, therefore, is whether that company has power conferred upon it by the legislature of Pennsylvania to hold these lands, by and through its ownership of the whole of the capital stock of the two other companies defendant or either of them.

2. That the power thus to become a stockholder in another corporation must be granted in the charter, either specifically or by necessary implication, is fully sustained by the authorities : Green's Brice's Ultra Vires, 91, note (b) ; Earnest v. Nichols, 6 H. L. 401 ; Sumner v. Marcy, 4 Wood. & M. 105 ; Bank v. Agency Co., 24 Conn. 159 ; Central R. Co. v. Collins, 40 Ga. 582 ; Hazlehurst v. Savannah, 43 Ga. 13 ; Solomon v. Laing, 14 Jur. 279 ; Franklin Bank v. Bank, 36 Ohio 354 (38 Am. Rep. 594). The defendant claims that it has such authority in the act of April 15, 1869, P. L. 32, permitting railroad and canal companies to aid mining corporations, etc., by the purchase of their capital stock, etc. But that act cannot avail the defendant here, as nothing can be taken by intendment in the grant of a franchise, and authority to aid a corporation

does not justify the acquisition of it: Commonwealth v. New York etc. R. Co., 114 Pa. 340. That act furnishes no warrant for the purchase of a charter for the purpose of evading a legal prohibition. The evidence shows that there was no purchase of stock; the thing purchased was the charter, and the transaction was merely colorable.

3. By the deed from Martin to Watson the latter became the legal owner of the lands conveyed, in trust for the Erie Railway Co. By the articles of agreement between Watson and Earley, Watson became the equitable owner of all the other lands involved, in trust for said railway company, and the effect of the agreement was that Earley held the legal title upon the same trust: Richter v. Selin, 8 S. & R. 440 ; Patterson's Est., 25 Pa. 71 ; Morgan v. Scott, 26 Pa. 51 ; Merkel's App., 10 W. N. 116. If the title was then defeasible, it has remained so ever since, and the subsequent execution of these trusts by conveyances from Watson and Earley to the Northwestern Mining & Exchange Co. will not validate it or bar the commonwealth's right to escheat the land, especially in view of the fact that those transfers were merely colorable : Leasure v. Hillegas, 7 S. & R. 313; Goundie v. Water Co., 7 Pa. 233; Rubeck v. Gardner, 7 W. 455.

4. The conveyances which Watson and Earley, by direction of the equitable owner, made to the mining and exchange company, executed the trusts imposed upon them; but, being a mere device to cover up the real ownership, those conveyances did not change the status of the title, and did not bring the case within the operation of the acts of May 8, 1876, P. L. 127; May 22, 1878, P. L. 85, and April 8, 1881, P. L. 9, confirming titles conveyed by foreign corporations to corporations of this state, authorized to hold such titles, before the commencement of any proceedings to escheat the land. Those acts do not affect this case; first, because no conveyance was in fact made by the railway company, but its ownership and control continued just as they had been, and were entirely unaffected by the colorable and sham transfers of the mere paper titles; and, secondly, because § 5, article XVII. of the constitution, renders wholly void any legislation subsequent to January 1, 1874, attempting to validate the title of a common carrier to any lands not necessary to its business as such, and

the legislature cannot confirm what they could not originally authorize: Sykes v. Mayor, 55 Miss. 137 ; Grenada v. Brown, 112 U. S. 261 ; Katzenberger v. Aberdeen, 121 U. S. 172.

5. The constitutional provision cited, which prohibits the direct or indirect engaging by common carriers in other business, and the holding by them, directly or indirectly, of any lands not necessary for their proper business, applies to foreign railway corporations doing business in this state. Such corporations are subject to the control of the commonwealth, as to the terms upon which they may hold land within her territory, to the same extent as corporations of her own creation; whether they shall do business here at all is a matter absolutely within the state's control: Doyle v. Insurance Co., 94 U. S. 535 ; Bank of Augusta v. Earl, 13 Pet. 519 ; Insurance Co. v. French, 18 How. 404 ; Paul v. Virginia, 8 Wall. 168 ; Ducat v. Chicago, 10 Wall. 410 ; Green's Brice's Ultra Vires, 4, note (a) ; Commonwealth v. Ferry Co., 98 Pa. 105 ; Runyan v. Coster, 14 Pet. 122. The rights of the New York, Lake Erie & Western Railroad Co., in this respect, do not relate back to those of the Erie Railway Co. as they existed prior to 1874, so as to be unaffected by the adoption of the constitution. The only legislation under which it could acquire, by virtue of the foreclosure sale in New York, the lines in this state formerly owned by the Erie Railway Co., is the act of May 1, 1876, P. L. 93, passed since the constitution was adopted.

6. Even this fact, however, is unnecessary to subject the company to the constitution, since it was organized in 1878, and, although called in common phrase a " re-organization " of the older company, it is in law a new corporation, and upon its coming into being in 1878 became subject to all the constitutional and statutory laws of the state then in force : Memphis etc. R. Co. v. Berry, 112 U. S. 609 ; St. Louis etc. R. Co. v. Berry, 113 U. S. 465 ; Chesapeake etc. Ry. Co. v. Miller, 114 U. S. 176 ; Dow v. Beidleman, 125 U. S. 680. The question, then, is whether, as a matter of fact, it does engage in business and hold lands contrary to the provisions of the constitution, either directly or indirectly. That it does, was clearly shown at the trial, and the transparent device of using the name and stock of the Northwestern Mining & Exchange Co., or of the New York, Lake Erie & Western Coal & Railroad Co., cannot

excuse its flagrant violation of the fundamental law or the consequences thereof.

7. A thing within the intention of the law maker is as much within a statute as if it were within the letter: Bac. Abr., Statute, I., §§ 5–10; Heydon's Case, 3 Rep. 7; Magdalen College Case, 11 Rep. 73: People v. Insurance Co., 15 Johns. 381. This rule of construction is specially applicable to constitutional enactments: Commonwealth v. Clark, 7 W. & S. 127; Gibbons v. Ogden, 9 Wheat. 2; Manley v. State, 7 Md. 135; Leonard v. Commonwealth, 112 Pa. 607; Chester Co. v. Brower, 117 Pa. 647. The holding in the present case is plainly within the scope and intent of the clear and broad prohibition contained in the constitution, and even if the act of April 15, 1869, P. L. 31, could be construed as legalizing the particular device adopted by the Erie Railway Co. for evading the acts of April 6, 1833, P. L. 167, and April 26, 1855, P. L. 329, neither the áct of 1869 nor any other act could in any way authorize or confirm the acquisition of these lands by the New York, Lake Erie & Western Railroad Co. after January 1, 1874, or its holding of them by any device whatsoever.

8. It is true, that ordinarily shares in a corporation owning real estate, are personal property, although for many purposes, and when necessary to do justice, the courts will consider the interest of the shareholder as an interest in the property of the corporation: Coleman v. Turnpike Co., 49 Cal. 517. A shareholder has an insurable interest in such property: Seaman v. Insurance Co., 21 Fed. R. 778; Warren v. Insurance Co., 31 Ia. 464 (7 Am. Rep. 160). And a tax upon the capital stock is a tax upon the property of the corporation: Commonwealth v. Standard Oil Co., 101 Pa. 119. But the question here is not whether the stock of the Northwestern Mining & Exchange Co. is personal property or not, but whether the railroad company owns the lands in question indirectly by means of that stock. If it does, and such holding is prohibited by the constitution, the lands are escheatable in this proceeding, as the provision for such escheating in the act of 1855, whenever the holding is not "specially authorized by the laws of this commonwealth," is applicable whether the illegality of the holding arises from the statutes or from the constitution of the state: Commonwealth v. New York etc. R. Co., 114 Pa. 340.

Arguments.

*Mr. John G. Hall* and *Mr. George W. Biddle*, for the appel
lees:

1. No interest in any of the lands mentioned in the informa-
tion accrued to the New York, Lake Erie & Western Railroad
Co. under the contract between Watson and Earley, or under
the subsequent conveyance to the Northwestern Mining & Ex-
change Co. A resulting trust arises only by the operation of
the legal presumption that the intention of the parties is to
create it. In the present case, the facts show the intention of
the parties to have been that the lands should be conveyed to
the mining and exchange company, a Pennsylvania corporation
authorized to hold them, and if Earley was trustee for anybody,
he was trustee for that corporation. From July 13, 1874, the
entire title was in it, until it subsequently conveyed the lands
to another Pennsylvania corporation having like authority to
take and hold them. In no event could a resulting trust arise
in favor of the Erie Railway Co. for a greater proportion of the
title than the $25,000, paid prior to the assignment of the con-
tract by Watson, bears to the whole purchase money. But no
matter where the equitable title was prior to July, 1874, the de-
fect of title, if any, was cured by the acts of May 8, 1876,
P. L. 127, May 22, 1878, P. L. 85, and April 8, 1881, P. L. 9.
An acceptance by the Northwestern Mining & Exchange Co.
of the constitution of 1874 is not a condition of the applica-
tion of these acts to it. It is not so, under § 10, article XVII.
of the constitution, because that company is not a railroad,
canal or transportation company, and is not subject to § 1, act
of May 22, 1878, P. L. 84, because no legislature can bind the
power of future legislatures.

2. The holding by the New York, Lake Erie & Western Rail-
road Co., a New York corporation, of the stock of the North-
western Mining & Exchange Co. which owns the stock of the
New York, Lake Erie & Western Coal & Railroad Co., the
corporation in which the present title to these lands is vested,
does not constitute any holding of the lands by the first named
corporation, and cannot be a holding of land within the mean-
ing of § 5, act of April 26, 1855, P. L. 329, and therefore there
was no question of " device " to submit to the jury. There
are no decisions on this subject in Pennsylvania, and but few
in the United States. To test the construction of the act of

1855 contended for, which would make shares of stock so held real estate, and therefore within the provisions of the act, we can look to the decisions under the English Mortmain act of 9 Geo. II., cap. 36, which have fully settled that such shares do not constitute in themselves any interest in real estate, even though the property of the corporation issuing them consists wholly of realty: Weekly v. Weekly, and Bligh v. Brent, 2 Y. & C. Eq. Cas. 281; Bradley v. Holdsworth, 3 M. & W. 422; March v. Attorney General, 5 Beav. 433; Thompson v. Thompson, 1 Coll. 381; Hilton v. Girard, 1 De G. & Sm. 183; Walker v. Milne, 11 Beav. 507; Curling v. Flight, 2 Phillips 613; Myers v. Perigal, 11 C. B. 90, 73 E. C. L. 90, 16 Sim. 553, 2 De G., McN. & G. 617.   The question has been substantially decided by the Supreme Court of the United States in Pullman Pal. Car Co. v. Railway Co., 115 U. S. 587, where the control of a corporation by the ownership of its stock is fully discussed.

3. There is a vast difference between the ownership of land by a foreign corporation, and its ownership of shares of stock in a mining company chartered by and under the control of the state.   To the latter are incident none of the evils which the statute of mortmain was designed to prevent.   The express enactment in § 3 of the very act under which a forfeiture is now claimed, however, renders the decisions cited unnecessary to sustain our position.   That section enacts that shares in certain classes of corporations, including mining companies, shall be taken to be personal property and not to create any title in the shareholder to the real estate held by such companies.   As this was but a re-statement of what had been the law before, the only purpose of its insertion was to cut up by the roots the possibility of the very argument now advanced in the commonwealth's name.   In the construction of a statute every part of it must be viewed in connection with the whole: Potter's Dwarris, 144, rule 12.   By the section referred to, the legislature unmistakably intended to declare that for the purposes of the act the holding of stocks, in the classes of corporations named, shall not be considered a holding of land "by device," though the holding of stocks in other corporations may be so.   The purchase of stock made in the present instance was authorized expressly by the act of April 15, 1869, P. L. 31.

Opinion of the Court.

Upon the right to aid mining companies by purchasing their stock which it confers, no restriction as to amount is placed. How the purchase of a controlling part or all of the stock ceases to be "aid," when in contemplation of law the two corporations are distinct entities, we do not understand.

4. The operation of § 5, article XVII. of the constitution, upon the rights of the railroad company in the lands in question, is not raised upon the present record, because the railroad company is stated by the information to be a foreign corporation, and it is not averred that it owns or operates a mile of railroad in this state; and the constitutional article containing that section assumes to and can regulate only corporations chartered by or doing business within the state. Nor can any escheat be declared under the act of April 26, 1855, P. L. 329, under which alone this proceeding is instituted, even if there were a technical infringement of the constitution. The ingenious argument for the commonwealth that because the constitution prohibits the holding of the lands by this railroad company, and its holding of the stock of the corporation which owns them, constitutes substantially a holding of the lands themselves, within the meaning of the constitution, and because the act of 1855 provides for an escheat of all lands held by corporations not authorized to hold them, therefore, these lands may be escheated in this proceeding for violation of the constitutional provision, falls to the ground as soon as we supply the omitted premise that the act of 1855 itself declares that the holding of stock in a mining corporation shall not be deemed a holding of lands for the purposes of its enactments respecting such forfeitures.

OPINION, Mr. CHIEF JUSTICE PAXSON:

This was an information in the nature of a quo warranto, filed by the attorney general, the object of which was to escheat to the commonwealth certain lands in Elk county, alleged to be held by or for the defendant railroad company. The facts, as disclosed by the evidence and admitted by the parties, do not differ essentially from those in Commonwealth v. Railroad Co., reported in 114 Pa. 340. This is really a branch of the same proceeding, but for lands lying in a different county. The present case has been twice argued, a re-argument having

been ordered of our own motion, and has received careful consideration. This was due to the gravity of the questions involved and the amount in controversy.

It was alleged, in the first place, by the commonwealth that the railroad company had violated § 5, article XVII. of the constitution of this state. The said section is as follows:

" No incorporated company doing the business of a common carrier shall directly or indirectly, prosecute or engage in mining or manufacturing articles for transportation over its works; nor shall such company, directly or indirectly, engage in any other business than that of common carriers, or hold or acquire lands, freehold or leasehold, directly or indirectly, except such as shall be necessary for carrying on its business; but any mining or manufacturing company may carry the products of its mines and manufactories on its railroad or canal, not exceeding fifty miles in length."

It will be noticed that this clause in the constitution affixes no penalty for its violation. It is conceded that, for a violation of the organic law, a Pennsylvania corporation, or a foreign corporation having or exercising corporate franchises within this commonwealth, would forfeit such franchises. This, however, would not involve an escheat or confiscation of its property. For present purposes, we must regard this constitutional provision as out of the case. The question here is whether the real estate in controversy is liable to escheat. This is not a proceeding to forfeit the company's franchises, but to escheat its lands. It must rest, if it can be sustained at all, upon the act of April 26, 1855, P. L. 329, the fifth section of which provides that:

" No corporation . . . . . shall . . . . . hereafter acquire and hold any real estate within this commonwealth directly in the corporate name, or by or through any trustee or other device whatsoever, unless specially authorized to hold such property by the laws of this commonwealth."

This is the prohibition of the act. The penalty for its violation is contained in section 9. It is as follows:

" That all property hereafter acquired and held by persons, corporations, or associations forbidden by this act to hold the same, . . . . and all such hereafter acquired and held beyond the limit prescribed as aforesaid by this act, shall escheat

to this commonwealth, and, upon the same being adjudged to have escheated under proceedings in court by quo warranto in all respects as is provided by law in the case of the usurpation of any corporate franchise, the same shall be taken in possession and disposed of," etc.

It was not alleged that the defendant railroad company held the title to any of the lands in controversy, either in its corporate name or by or through a trustee. The contention of the commonwealth was that the title thereto was held by the Northwestern Mining & Exchange Company, defendant; that all of the stock of said last-named company was held by the said railroad company, and that the placing of the title in the former company was a mere "device" to enable the railroad company to hold lands indirectly which it was forbidden by the act of 1855 to hold directly, or by or through a trustee. Whether it was such "device" was the question we directed to be submitted to the jury when the other branch of the case was here, reported in 114 Pa. 340.

It is not denied that the Northwestern Mining & Exchange Company is a Pennsylvania corporation, and authorized by its charter to hold these or similar lands, and to carry on the business of mining, milling, smelting, and refining gold, silver, copper, iron, lead, and other ores, coal and other minerals. Nor was it denied that under the act of April 15, 1869, P. L. 31, the New York, Lake Erie & Western Railroad Company had the right to purchase and hold all or any portion of the stock of the Northwestern Mining & Exchange Company. The said act expressly declares:

"That it shall and may be lawful for railroad and canal companies to aid corporations authorized by law to develop the coal, iron, lumber and other material interests of this commonwealth, by the purchase of their capital stock and bonds, or either of them, or by the guaranty of or agreement to purchase the principal and interest, or either, of such bonds."

The object of this legislation is obvious. It was to authorize railroad and canal companies to employ their capital and credit to aid in the development of the mineral resources of the commonwealth. Such development, as every one knows, is in many instances beyond the reach of individual enterprise. It was easy enough to form corporations with all the requisite

powers for this purpose. It was a very different thing to find capitalists to take their stocks or bonds. Hence it was that the legislature gave to railroad and canal companies the power to purchase both stocks and bonds of such companies. Nor was any limitation placed upon this power. They might buy a portion or all of the stock. It probably never occurred to the legislative mind that, while the purchase of a portion of the stock of a mining company would be aiding such corporation to develop the mineral resources of the state, the purchase of a majority of or the whole of the stock of such company might be held to be a "device" to evade the act of 1855. However that may be, the act of 1869 was evidently intended to legalize, and perhaps encourage, railroad and canal companies to invest in this species of mining companies. It involved, necessarily, the control of such companies by the corporations making such investments, to the extent of the stock held by them. A majority of the stock controls the corporation; the corporation controls the land held by it. In this sense, and to this extent, the act of 1869 enabled railroad companies to control real estate, the title to which they were forbidden to hold directly or indirectly by the act of 1855. It must not be forgotten, however, that controlling real estate, by means of the ownership of a majority of the stock of such corporation, is a very different matter from holding the title to such real estate. The one is legalized by the act of 1869; the other is forbidden by the act of 1855.

It appears by the evidence that the railroad company purchased the charter of the mining company, and retained all of the stock thereof, except the number of shares requisite to qualify the directors. It is admitted that the whole interest in the stock of the mining company was owned and controlled by the railroad company. It was contended that this was not aiding the mining company, but was a mere scheme or "device" to hold lands in violation of law. This was the view taken of it by our Brother STERRETT, in the former opinion of this Court, and in that case it was directed that the question whether it was a "device" to evade the act of 1855 should be submitted to a jury. That case was not heard before a full bench; those who heard it were not unanimous; it involved a question of grave importance, and a majority of those who

heard the argument were in favor of taking the verdict of a
jury upon the facts. As the question is now presented here,
and as it was presented below, there are no disputed facts. It
is conceded that at the time these proceedings were commenced
the title to the lands was in the Northwestern Mining & Ex-
change Company ; that the said company was expressly au-
thorized by law to hold them ; that the stock of said last-named
corporation is held or controlled by the railroad company,
which company is in terms authorized by the act of 1869 to
hold it ; that the stock so held is personal property, and that
the railroad company does not hold the title to said real estate,
or to any portion of it either in its own name, or by or through
a trustee. With the facts upon the record undisputed, we can-
not evade the responsibility of this case by throwing it upon a
jury. With the facts admitted, it is the duty of this court to
pass upon their legal effect, and the verdict of a jury could not
aid us. Moreover, if we submit this question to a jury, we
would have no rule whatever. Different juries, in different
counties, might find conflicting verdicts, in which case we
would have the strange result that in one county the transac-
tion would be held to be legal, while in an adjoining county
it would be held to be illegal. We were informed upon the
argument, and have no doubt of its truth, that a vast amount
of real estate in this commonwealth is held by corporations
similar to the Northwestern Mining & Exchange Company,
and chartered by the state for the purpose, inter alia, of hold-
ing the title to such property ; that the stock of said com-
panies is largely held by railroad corporations, in pursuance of
the act of 1869, and that the said real estate is in whole or in
part controlled by the latter class of corporations, by means of
their stock. If in all such cases the question whether the
holding of such stock is a " device " on the part of the railroad
companies to evade the act of 1855 must be submitted to a
jury, the consequences might be very serious and destructive
of vested rights. To say the least, it would introduce an
element of uncertainty into the titles to a large amount of
property, which it would be difficult for a purchaser to protect
himself against. The possibility of such results admonishes
as to move with caution, and to hesitate ere we finally adopt
a principle which may lead to such confusion.

If there is anything that is clear in this case, it is that the defendant railroad company has no title, legal or equitable, to this land. Its whole title thereto, in fee-simple, passed by the conveyance to the Northwestern Mining & Exchange Company. Attention is again called to the act of 1855; and, at the risk of being prolix, I repeat it:

" No corporation . . . . . shall . . . . . hereafter acquire and hold any real estate within this commonwealth, directly in the corporate name, or by or through any trustee, or other device whatsoever, unless specially authorized to hold such property by the laws of this commonwealth."

It will be observed that the prohibition of the act is of a threefold character, viz.: (*a*) Holding real estate in its corporate name; (*b*) by means of a trustee; and (*c*) by any device whatever. It must be conceded, indeed it is not denied, that there is no violation of the first two prohibitions. It is equally clear to my mind there is no violation of the third, for the reason that the railroad company has, as before stated, no title to the real estate of any kind. If it has no title, how can it hold title by a "device?" The only answer that has or can be made to this is that the company controls said real estate. If we concede this proposition, where, in the act of 1855, is there to be found a prohibition of a railroad company controlling the use of real estate? The act strikes only at the holding of the title; and, as it is a highly penal statute,—penal to the extent of practically confiscating all real estate held in violation thereof,—we are not at liberty to extend it beyond its terms. The legislature may have had good reasons to prohibit railroad companies from holding the title to large bodies of mining lands. They may not have had the same reasons to move them to prohibit all control over them. At any rate, they have not done so, which is sufficient for our purpose.

As before observed, this is a question of escheat. It must be manifest that, before there can be an escheat of these lands under the act of 1855, it must appear that the defendant railroad company holds the title thereto in its corporate name, or by or through a trustee, or by some device by means of which said company not only controls the lands, but enjoys the beneficial ownership thereof. In other words, it must have either the legal or the equitable title, or it has no title whatever. If it

has no title, there can be no escheat of the lands as real estate. The third section of the act of 1855, which does not appear to have been heretofore called to our attention, provides:

" That the shares held by shareholders in all incorporated land and building associations, and mining and manufacturing companies, shall be taken to be personal property, conferring a right to receive dividends of the profits and proceeds of the real estate held by such companies, but not to create any title in the shareholder in or to such real estate, which shall be subject only to the liens of and be fully conveyed by the corporation holding the title and owning the same. "

This section of the act of 1855 is a distinct declaration by the law-making power that shares of stock held in a mining company are personal property, and create or give no title to the holder of such shares in or to any of the real estate held by such company. How, then, is it possible to escheat it as real estate, belonging to or held for the company owning the shares? The law having fixed its character, I do not see how the parties can change it, even by a " device."

The act of April 8, 1881, P. L. 9, enacts:

" That where any conveyances of real estate in this commonwealth have been made by any alien, or any foreign corporation or corporations of another or of this state, to any citizen of the United States, or to any corporation chartered under the laws of this commonwealth and authorized to hold real estate, before any inquisition shall have been taken against the real estate so held to escheat the same, such citizen or corporation, grantee as aforesaid, shall hold and may convey such title and estate indefeasibly as to any right of escheat in this commonwealth, by reason of such real estate having been held by an alien, or corporation not authorized to hold the same by the laws of this commonwealth."

While I do not consider this act important in the determination of this case, as the contention of the commonwealth cannot be sustained for the reasons already given, it is proper to say that it appears to condone the alleged offence, so far as the legislature may lawfully do so. It removes the penalty of escheat imposed by the act of 1855. It may be said, however, that it is controlled by section 10, article XVII. of the constitution, which declares:

"No railroad, canal, or other transportation company, in existence at the time of the adoption of this article, shall have the benefit of any future legislation by general or special laws, except on condition of complete acceptance of all the provisions of this article."

In the absence of any evidence that the defendant company had accepted the provisions of the above article, it is urged that it cannot claim the benefit of the act referred to. It is doubtless true that, before a railroad company can enjoy the benefit of new legislation enlarging its powers or increasing its facilities, it must formally accept all of the provisions of the seventeenth article of the constitution relating to railroads and canals. This question, however, is not raised. The act of 1881 is in the way of the commonwealth. No one doubts that the act of 1855, imposing the penalty of escheat, could at any time have been repealed by the legislature. The repeal of the act would have been an answer to this proceeding. The commonwealth would have nothing to rest it upon. The act of 1881 does not in terms repeal the act of 1855, but it removes the penalty. This information was not filed until several years after the passage of the act of 1881 ; nor had any inquisition been taken against the real estate in controversy, until after it had been conveyed to the Northwestern Mining & Exchange Company. The case comes, therefore, precisely within the terms of the act of 1881, and, were we in doubt as to our former position, we might well affirm the judgment upon this ground alone.

We have considered this case solely upon the power of the commonwealth to escheat the lands. No question is raised under the constitutional provision referred to, and none is decided.

Judgment affirmed.

Mr. Justice STERRETT and Mr. Justice CLARK dissented.