**CHICAGO, R. I. & P. R. Co. et al. v. GIST.**

No. 8820—Opinion Filed June 15, 1920.

(Syllabus by the Court.)

1. **Carriers—Action to Recover Freight Overcharges — Jurisdiction of State Courts.**

State courts have jurisdiction in an action against a common carrier to recover the difference between illegal and excessive freight charges and the established rate prescribed by law, the issue involved being one of fact, though in passing on the facts it may be necessary for the court to construe the rate established by law.

2. **Same—Common-Law Rights.**

At common law where a carrier refused to receive goods offered for carriage except upon the payment of an unreasonable sum, or received the goods and carried them and then exacted an unreasonable charge as a condition of the delivery of the goods, an action could be maintained in court to recover the excess over a reasonable charge.

**3. Same—Interstate Commerce—Territories —Interstate Commerce Commission.**

After the passage of the act of Congress of February 4, 1887, known as the Interstate Commerce Act, a shipper could not maintain an action against a common carrier to obtain relief from an alleged unreasonable freight charge exacted from him for an interstate shipment or shipment from one territory to a point of destination in another territory, without reference to any previous action by the Interstate Commerce Commission, where such rate had been filed with that commission and promulgated, as provided by the Commerce Act, as the rate which it was the duty of the carrier under that act to enforce against the shipper, until changed in accordance with the provisions of that statute.

**4. Territories—Sovereignty of United States.**

The United States had full sovereignty within the Indian Territory.

**5. Carriers — Freight Rates—Federal Act Affecting Indian Territory—Effect of Organizing Oklahoma Territory.**

The provisions of the Choctaw Coal & Railway Company Right-of-Way Act of Congress, approved February 18, 1888, prohibiting the railway from charging the inhabitants of Indian Territory a greater rate of freight than authorized by the laws of the states of Arkansas and Texas for services and transportation of the same kind, were superseded, abrogated, and annulled by the act of Congress of May 2, 1890, known as the Organic Act, under which the territory of Oklahoma was carved out of the Indian Territory and became an organized territory, in so far as rates on shipments from Indian Territory to points of destination in Oklahoma Territory were concerned.

**6. Territories—Political Status of Oklahoma Territory.**

Oklahoma Territory, by the act of Congress of May 2, 1890, though carved out of the Indian Territory, became a political entity as an organized territory of the United States, and thenceforth was as separate and distinct from the Indian Territory as any other organized territory of the United States.

**7. Same—Carriers—Shipments from Indian Territory to Oklahoma Territory—Jurisdiction of Interstate Commerce Commission.**

The Oklahoma Territorial Organic Act of Congress of May 2, 1890, operated to cut the Indian Territory into two separate territories, one organized and the other unorganized, and immediately and concurrently with the creation of the territory of Oklahoma, the transportation of property by railroad from point of origin in the Indian Territory, as that territory existed after the act of May 2, 1890, to the place of destination within the territory of Oklahoma, fell under the jurisdiction of the Interstate Commerce Commission.

**8. Same.**

The provisions of the Interstate Commerce Act of February 4, 1887, covered transportation from a territory to a territory, without regard to the geographical boundary lines of the territories at the time it was enacted. The act looked to the future as well as the then present.

**9. Carriers—Nature of Rate-Making Power.**

The rate-making power is legislative, and not judicial.

**10. Statutes—Construction—Contemporaneous History.**

Courts, in construing a statute, may with propriety recur to the history of the times when it was passed; and this is frequently necessary, in order to ascertain the reason as well as the meaning of particular provisions in it.

**11. Same.**

The history of the times during which a law was enacted tends strongly to disclose the reasons for the act, and therefore the evils sought to be remedied.

**12. Same—Judicial Notice.**

Whenever light can be derived from such sources, the courts will take judicial notice of the facts of contemporaneous history, the prior state of the law, the particular abuse or defect which the act was meant to remedy, and will then apply the language of the act to such state of affairs.

Error from District Court, Garfield County; James B. Cullison, Judge.

Action by J. T. Gist against the Chicago, Rock Island & Pacific Railway and another to recover freight overcharges. Judgment for plaintiff, and defendants bring error. Reversed.

The defendant in error, as plaintiff below, commenced this action against the plaintiffs in error in the district court of Garfield county November 5, 1906, to recover $3,737.50, plus seven per cent. interest, as the alleged amount due plaintiff for freight overcharges on coal shipped over the lines of defendants from Alderson, Wilburton, Haileyville, Dow, Krebs, Bakers, McAlester, and other points in the Indian Territory, to Enid, Oklahoma Territory. Counsel for defendant in error, beginning on page 2 of his printed brief, states plaintiff's case as follows:

"The petition alleged that the defendants were railway corporations operating in the Indian Territory and the territory of Oklahoma, that they were common carriers of property, and as such carried coal to the city of Enid, Oklahoma Territory, during the three years before the filing of the petition, that the place from which the coal was trans-

ported to Enid, with the number and initial of the car transporting it, the amount of coal, the amount of freight and expenses, the date of payment, and the amount which plaintiff says was overcharged, are each correctly set out in a schedule attached to the petition, marked 'Exhibit A,' and made a part thereof, and that the defendants at the times named in the schedule for the transportation of the coal at Enid collected from the plaintiff a large sum of money in excess of the legal rate. The petition then alleges four grounds of illegality:

" '1. That the charges were not reasonable and just but were unreasonable and unjust.

" '2. That the sum collected ' subjected plaintiff to an undue and unreasonable prejudice and disadvantage.

" '3. That the charge received by the carrier was greater compensation in the aggregate for the transportation of like kind of property, under similar circumstances and conditions, for shorter than for longer distances, over the same line, in the same direction.

" '4. That the charges were unreasonable and illegal in that the same exceed the sums allowed by law as a maximum to be charged by the railroads, to the plaintiff as an inhabitant of the territory embraced within the limits of what was formerly the Indian Territory, and as to him the said defendants not being authorized by law to charge a greater amount than is authorized by the laws of the state of Arkansas, and that by the laws of the state of Arkansas a lesser sum in each instance was authorized than that charge, the amount of the overcharge calculated upon the rates authorized by the rates of Arkansas being shown in the list claimed in the schedule marked "Exhibit A." '

"The petition also alleged that the sums were paid by plaintiff under compulsion, as the only condition under which he could get possession of the coal, and after demanding that the coal be delivered to him at the lower legal rate.

"**It is unnecessary to consider the first, second, and third grounds of illegality above stated, because they are but different ways of pleading what is set out in greater detail in the fourth ground.**

"**In short, the whole petition was that the defendants, although authorized under the federal law to charge the inhabitants of Oklahoma Territory a rate not greater than that of Arkansas, for the same service and transportation, did in fact charge a greater rate than this in the amount stated in the overcharge. and, as a consequence, the pleader deemed this unreasonable and unjust,** that it subjected the plaintiff to an undue prejudice and disadvantage in that the same is a greater charge than is made by the carriers in other localities of other persons, for similar services (meaning, of course, in the state of Arkansas), and that the same is an unjust and unreasonable charge, in that the carriers received a greater compensation in the aggregate for the transportation of a like kind of property and under similar circumstances and conditions.

"Upon the third ground, no evidence was offered.

"The second and third grounds are the consequences that flow from the proof offered on the fourth ground, so it is only necessary to consider the fourth ground to have the entire case in hand.

" * * * We did entirely fail to offer any evidence under the third ground, and it may be considered **that we have abandoned** that.

"Now, the second and third causes of action are precisely like the first, except that in the second cause of action it is stated that the Enid Ice & Fuel Company **was a corporation under the laws of the territory of Oklahoma,** and that it transported coal under exactly similar facts as those alleged by the plaintiff here, that it paid similar overcharges, and before the bringing of the action the Enid Ice & Fuel Company assigned its claim for damages to the plaintiff for value, as shown by copy of the written assignment attached to the petition and made a part of it, as 'Exhibit C.'

"The third cause of action is just like the second cause of action, except that in this case the transporter of the coal is W. B. Johnston." (Emphasis ours.)

The defendants filed separate demurrers on the ground (1) That the court has no jurisdiction of the subject of the action; (2) that there is a defect of parties plaintiff; (3) that several causes of action are improperly joined; (4) that the petition does not state facts sufficient to constitute a cause of action. Defendants' demurrers were overruled and exceptions saved, and thereupon defendants filed special pleas to the jurisdiction of the court. As special pleas are not recognized by the Code of Civil Procedure, and as the substance of the special pleas was set forth in the answers, it is unnecessary to state the substance thereof. The Rock Island filed an answer, containing (1) a general denial; (2) that the defendant, Chicago, Rock Island & Pacific Railway Company, is and was at all times mentioned in the plaintiff's petition a common carrier by railroad of freight and passengers, being a corporation organized and existing under the laws of the states of Illinois and Iowa and owning and operating a line of railroad leading from the city of Chicago, in the state of Illinois, into and through the territory of Oklahoma and the territory comprising the Indian Territory at the time the freight shipments complained of in the petition were made; that it had physical con-

nection with its codefendant, Choctaw, Oklahoma & Gulf Railroad, at El Reno, Oklahoma Territory; that in pursuance of law it had published and filed with the Interstate Commerce Commission tariffs fixing and establishing rates on coal (being the freight hauled for plaintiff and plaintiff's assignors) between the points of origin set forth in plaintiff's petition and the city of Enid, the place of destination, as well as other points of destination; that defendant's tariff rates were open to all shippers alike and had not been suspended by the Interstate Commerce Commission at the time of the movement of the shipments detailed in plaintiff's petition, but were in full force and effect; that the Interstate Commerce Commission is by law vested with authority to determine the reasonableness of freight rates upon shipments of freight moving between territories of the United States, to the exclusion of any other tribunal; that therefore the court was without jurisdiction over the subject-matter. That under the laws of the Congress of the United States, the jurisdiction to entertain suits of the character plaintiff had commenced against defendant, was at the time exclusively vested in the Interstate Commerce Commission and the district courts of the United States, and that consequently the state court was without jurisdiction. (3) That on July 8, 1907, plaintiff filed a petition with the Interstate Commerce Commission asking that the rates assessed and charged by defendant and its codefendant on the identical shipments of coal be declared unreasonable and that defendants be required to make reparation; that the Interstate Commerce Commission heard the petition and dismissed it on the ground that it had no jurisdiction to enforce rates established by federal charters. In the ninth paragraph of the answer, defendant denied that by the laws of the state of Arkansas a lesser sum in each instance was authorized than was charged for the transportation of the shipments of coal involved in this action, and averred that there were at the times the shipments involved were moved no rates authorized by the laws of the state of Arkansas and Texas for service and transportation of coal "which were capable of being applied to the shipments involved in this action at the time they were moved."

The Choctaw, Oklahoma & Gulf Railroad Company filed a similar answer and admitted that it was a corporation organized under the laws of Congress and owned a line of railway extending from the boundary line between the state of Arkansas and the Indian Territory, through said Indian Territory and into Oklahoma Territory and connecting at El Reno, Oklahoma Territory, with the line of its codefendant. The plaintiff filed replies denying generally the allegations

in the answers. The case was tried in February, 1916, at which time defendants demurred to plaintiff's evidence. The demurrer was overruled and exception saved. Thereupon, defendants offered some evidence and a judgment was rendered in favor of the plaintiff for the sum of $3,281.55 as principal, and $2,625 as interest, making a total of $5,906.55. Motion for a new trial was filed in due time and overruled and exception saved, and the case is here on petition in error.

C. O. Blake, R. J. Roberts, W. H. Moore, J. E. DuMars, and K. W. Shartel, for plaintiffs in error.

Chas. West, for defendant in error.

RAMSEY, J. (after stating the case above). By the act of Congress approved February 18, 1888 (25 St. L. 35), the Choctaw Coal & Railway Company, a corporation created under the laws of the state of Minnesota, was granted the right of constructing, owning, equipping, and operating a line of railroad through the Indian Territory, beginning at a point on Red River (southern boundary line), at Rocky Cliff in the Indian Territory, and running thence by the most practicable route through the Indian Territory to the western line of the state of Arkansas; it was also authorized to construct and operate a branch line from its main line in a northwesterly direction to the leased coal veins of the Choctaw Coal & Railway Company in the Choctaw Nation. Section 4 of said act is as follows:

"That said railway company shall not charge the **inhabitants of said territory a greater rate of freight than the rate authorized by the laws of the state of Arkansas and Texas for services and transportation of the same kind**: Provided, That passenger rates on said railway shall not exceed three cents per mile. **Congress hereby reserves the right to regulate the charges for freight and passengers on said railway and messages on said telegraph and telephone lines, until a state government or governments shall exist in said Territory within the limits of which said railway, or a part thereof, shall be located; and then such state government or governments** shall be authorized to fix and regulate the cost of transportation of persons and freights within their respective limits by said railway; but Congress expressly reserves the right to fix and regulate at all times the cost of such transportation by said railway or said company whenever such transportation shall extend from one state into another, or shall extend into more than one state. * * *"

The Choctaw Coal & Railway Company becoming financially embarrassed, Congress by an act approved August 24, 1894 (28 St. L. 502), in furtherance of its reorganization, for the purpose of completing the road, pro-

vided that the purchasers of the rights of way, railroad, etc., at any sale made under or by virtue of any process or decree of court having jurisdiction "shall be, and are hereby, constituted a corporation and shall be vested with all the right, title, interest, property, possession, claim, and demand in law and equity, of, in and to such rights of way, railroads, mines, coal leasehold estates, and property of the said Choctaw Coal & Railway Company, and with all the rights, powers, immunities, privileges, and franchises which have been heretofore granted to or conferred upon said company by any act or acts of Congress, or which it possesses by virtue of its charter under the laws of Minnesota." Section 4 of that act provided that it would be lawful for such new corporation "to lease its railroads and mines and other property to any company owning or operating a railroad connecting with the railroad of said new corporation on such terms and conditions as may be agreed upon."

The Choctaw, Oklahoma & Gulf Railroad Company, one of the plaintiffs in error, became the purchaser.

The coal hauled over the lines of defendants for the plaintiff and his assignors was shipped from within a radius of about 50 miles, including McAlester and Wilburton, Indian Territory, over the railroad line belonging to the Choctaw, Oklahoma & Gulf Railroad Company (successor to Choctaw Coal & Railway Company) to El Reno, Oklahoma Territory, where physical connection was made with the line of railroad owned by the defendant Chicago, Rock Island & Pacific Railway Company, and thence to Enid over the line of road belonging to the latter company. The Chicago, Rock Island & Pacific Railway Company purchased, under the authority of an act of Congress approved June 27, 1890, granting the Chicago, Kansas & Nebraska Railway Company power to sell and convey to the Chicago, Rock Island & Pacific Railway Company, all railway property, rights, and franchises of the Chicago, Kansas & Nebraska Railway Company "in the territory of Oklahoma and in the Indian Territory." Congress, by act approved March 2, 1887 (24 St. L. 446), granted a right of way to the Chicago, Kansas & Nebraska Railway Company, a Kansas corporation, through the Indian Territory, beginning at a point in the northern line of said territory near the state of Kansas crossed by the one hundred and first meridian, thence southwesterly toward El Paso, and also a right of way beginning at a point on the south line of Kansas, near Caldwell, in Sumner county, thence to or near Fort Reno, and from thence in a southerly direction to the south line of the Indian Territory in the direction of Galveston, Texas. Section 4 of said Chicago, Kansas & Ne-

braska Railway Company right of way act, approved March 2, 1887, provides:

"That said railroad company shall not charge the **inhabitants of said territory** a greater rate of freight than the rate authorized by the laws of the state of **Kansas** for services or transportation of the same kind: Provided, that passenger rates on said railway shall not exceed three cents per mile. Congress hereby **reserves the right to regulate the charges for freight and passengers, on said railway** and messages on said telegraph and telephone lines, until a state government or governments shall exist in said territory, within the limits of which said railway, or a part thereof, shall be located; and then such state government or governments shall be authorized to fix and regulate the cost of transportation of persons and freights within their respective limits by said railway; **but Congress expressly reserves the right to fix and regulate at all times the cost of such transportation by said railway or said company whenever such transportation shall extend from one state into another, or shall extend into more than one state. * * *"**

The coal shipped from points in the Indian Territory to Enid, for excessive freight charges on which plaintiff sues in this case, traveled over the line of the Choctaw, Oklahoma & Gulf Railroad Company to El Reno, and thence over the line of the Chicago, Rock Island & Pacific Railway Company to Enid. Before any of the shipments of coal complained of were made, the Chicago, Rock Island & Pacific Railway Company obtained a 999-year lease on the road of the Choctaw, Oklahoma & Gulf Railway Company and was operating the leased line with its other lines as a unit.

Plaintiff's contention is this: That the act of Congress of February 18, 1888, granting the right of way to the Choctaw Coal & Railway Company, the predecessor of the Choctaw, Oklahoma & Gulf Railway Company, limited the maximum freight rate chargeable by that company and its successors to a rate equivalent to the rate for services and transportation of the same kind prescribed by the laws of Arkansas and Texas, and if there be a difference between the rates of Arkansas and Texas for the same service, "the lower of those two rates is the maximum, beyond which the railroads shall not charge"; using the language of plaintiff's counsel. In other words, if Texas has a higher rate than Arkansas for the same services and transportation, the rate prescribed by Arkansas controls, and vica versa. Defendants contend that the so-called franchise rate of the Choctaw Coal & Railway Company is void for uncertainty in that it is absolutely impracticable to apply the rates of two states or to ascertain from the language of the franchise act which state was intended to

control in the event there was a conflict between the two; further; that the courts have no jurisdiction to pass on these questions, because the ascertaining of what is the correct rate is an administrative function, and not judicial. Defendants contend that by the act of Congress of February 4, 1887 (24 St. L. 379), under which the Interstate Commerce Commission was organized, authority to determine what rates controlled was conferred upon the Interstate Commerce Commission and the federal courts, and that consequently the state court has no jurisdiction. Plaintiff's theory is that he is not seeking to establish a rate, but suing to recover the difference between illegal and excessive charges and the established rate prescribed by law, and if he be correct in his theory, state courts have jurisdiction to enforce his rights. If there was an established rate prescribed by law, then the question whether or not defendants charged more than that rate is a question of fact, though in passing on the fact it may be necessary to construe the law. If plaintiff's theory is correct, the state court has jurisdiction because the relief he prays for involves merely the judicial determination of certain facts, and in no sense involves administrative functions. Plaintiff challenges the jurisdiction of the Interstate Commerce Commission to recognize rates filed by the defendants. The holding in Texas P. R. Co. v. Abilene Cotton Oil Co., 204 U. S. 425, 51 L. Ed. 553, is inapplicable on plaintiff's theory. Plaintiff is not seeking to recover the difference between reasonable and unreasonable freight rates. He contends that the act of Congress, by reference to the Arkansas laws, has prescribed a standard of rates and that he has made out his case when he compares the freight charges made by the defendants and paid by him with the rates provided by the Arkansas laws. The difference is what he seeks to recover, and if he can get that far with his case, the state court undoubtedly has jurisdiction. Pennsylvania R. R. Co. v. Puritan Coal Co., 237 U. S. 121; Pennsylvania R. Co. v. International Coal Mining Co., 230 U. S. 184; Rock Milling & Elevator Co. v. Atchison, T. & S. F. Ry. Co. (Kan.) 158 Pac. 859; Spence v. Southern Ry. Co. (S. C.) 90 S. E. 750; McCullough v Missouri Pacific Ry. (Kan.) 160 Pac. 214; Hardaway v. Southern Ry. Co. (S. C.) 73 S. E. 1020: Hilton Lumber Co. v. Atlantic Coast Line R. Co., 6 L. R. A. (N. S.) 225.

The first section of the Interstate Commerce Act of February 4, 1887, declares that its provisions shall apply to any common carrier or carriers engaged in the transportation of passengers or property by railway "from one state or territory of the United States, or the District of Columbia, to any other state or territory of the United States, or the Dis-

trict of Columbia, or from any place in the United States to an adjacent foreign country", etc. The act authorized the appointment of commissioners and the organization of the Interstate Commerce Commission and conferred upon it certain powers and jurisdiction. The Commerce Act did not confer upon the Interstate Commerce Commission any jurisdiction over rates, passenger or freight, for the transportation of passengers or property wholly within a state or territory of the United States, but did expressly apply to carriers engaged in the transportation of passengers or property "from * * * a territory of the United States * * * to any other * * * territory of the United States," etc. The fact that the Commerce Act had no application to the transportation of passengers or property from one point in a territory to another point in the same territory largely accounts, in our judgment, for the provisions in the congressional railroad right-of-way acts, including the act approved February 18, 1888 (25 St. L. 35), granting a right of way to the Choctaw Coal & Railway Company, in which said railway company was prohibited from charging "the **inhabitants of said territory** (meaning the Indian Territory as it geographically existed at that time) a greater rate of freight than the rate authorized by the laws of the states of Arkansas and Texas for services and transportation of the same kind." Likewise, it accounts for the limitations on the freight and passenger rates imposed on the Chicago, Kansas & Nebraska Railway by the act of Congress of March 2, 1887 (24 St. L. 446), declaring that "said railway company shall not charge the **inhabitants of said territory** a greater rate of freight than the rate authorized by the laws of the state of Kansas for services or transportation of the same kind." Likewise, other congressional acts granting rights of way through territories limited the amount of passenger and freight rates to the rate of some adjoining state, prescribed for similar service. The limitation on rates prescribed by the various railroad right-of-way acts was evidently a makeshift; the rates of adjoining states were to be temporarily in force, not permanent, but merely to exist till a change in conditions brought the carriers under the scope of the Commerce Act. It is argued by plaintiff that these various acts of Congress above mentioned, as well as others, having been passed after the Commerce Act, they are therefore special and cover subjects not within the scope of the Commerce Act. That is true, so long as the territory remained a territory, but when it became a state, or subdivided into territories, the Commerce Act became operative, or rather, more accurately speaking, the railroads came within the scope of the Commerce Act. The Commerce Act was not stationary, fixed

and bounded by geographic limitations. It was prospective—it looked to the future as well as the then present. Not until the Hepburn Act, approved June 29, 1906 (34 St. L. 584), was the Interstate Commerce Commission given jurisdiction over rates "from one place in a territory to another place in the same territory." The rate-making power is legislative, and not judicial. Interstate Commerce Commission v. Cincinnati, N. O. & T. P. R. Co., 167 U. S. 480, 42 L. Ed. 243; Loomis v. LeHigh Valley R. R., 240 U. S. 43; Minnesota Rate Cases, 230 U. S. 352; Pioneer Tel. & Tel. Co. v. City of Bartlesville, 40 Okla. 583; Shawnee Gas & Electric Co. v. Corporation Comm., 35 Okla. 454. Railroad building probably reached its greatest impetus in the eighties; they wound their sinuous course across state lines, penetrated all the territories, and invaded every frontier from ocean to ocean. They tapped the great marts of trade and gathered up passengers and freight in the great metropolitian cities; at the same time they passed over vast scopes of country frequently inhabited only by rattlesnakes and prairie dogs. Thus, what was reasonable compensation for carrying freight and passengers became a vast, complex problem, involving too many details to be worked out by Congress and state legislatures. Direct legislative control was too cumbersome and impracticable, and thus state legislatures and Congress found it not only expedient, but absolutely necessary, to create commissions and boards, to which legislative and administrative functions were delegated, to deal with these great carriers so that justice might be worked out between the shippers, the public, and the railroads. Courts may appeal to the historical facts contemporaneous with the enactment of legislation by Congress or the state legislature, to aid them in arriving at the true meaning, scope, and effect of such legislation. The history of the times during which a law was enacted tends strongly to disclose the reasons for the act, and therefore the evils sought to be remedied. As said in United States v. U. Pac. R. Co. 91 U. S. 72:

"Congress, in construing a statute, may with propriety recur to the history of the times when it was passed; and this is frequently necessary, in order to ascertain the reason as well as the meaning of particular provisions in it."

Whenever light can be derived from such sources, the courts will take judicial notice of the facts of contemporaneous history, the prior state of the law, the particular abuse or defect which the act was meant to remedy, and will then apply the language of the act to such state of affairs. Davidson v. Gibson 56 Fed. 446; deGraffenried v. Iowa Land & Trust Co., 20 Okla. 716; People v. Supervisors of Columbia Co., 43 N. Y. 130; Lake v. Caddo Parish, 37 La. Ann. 788; United States v. Oregon & C. R. Co., 57 Fed. 426; Rector of Holy Trinity Church v. United States, 143 U. S. 457.

For a history of commissions created in the various states invested with legislative and administrative authority over carriers and public utilities, see the opinion of Mr. Justice Brewer in Interstate Commerce Commission v. Cincinnati, N. O. & T. P. R. Co., 167 U. S. 480, 42 L. Ed. 243. Neither the Interstate Commerce Commission nor any other commission or board was created and endowed by Congress with legislative and administrative authority to pass on or regulate rates of common carriers within the territories until the Hepburn Bill, passed in 1906. Realizing the difficulties confronting Congress in a direct effort to regulate rates to be charged by common carriers within the territories, and realizing that the Interstate Commerce Commission had no jurisdiction under the Commerce Act of February 4, 1887, over passenger and freight rates from points to points within a territory, Congress left the railroads to fix their own rates, not to exceed, however, the lawful rates prescribed by certain states adjoining said territories. But each of the acts granting railway rights of way and placing limitations upon the maximum rates chargeable by reference to the laws fixing rates in adjoining states reserved, unnecessarily, however, the right of Congress to control such rates, and generally provided that when a state or states were erected out of the said territory, intrastate rates would pass under the jurisdiction of the state government. Neither the act of Congress of March 2, 1887, granting the right of way to the Chicago, Kansas & Nebraska Railway Company, limiting the freight rates to the maximum rates prescribed by Kansas for services or transportation of the same kind, nor the act of February 18, 1888, granting the right of way to the Choctaw Coal & Railway Company, limiting the maximum rates to those prescribed by the laws of Arkansas and Texas for services and transportation of the same kind, constituted an irrevocable freight and passenger rate contract. The rates prescribed were merely limitations on the maximum amount, and not a guarantee or contract for a maximum rate. Consequently, Congress, especially with the consent of the railway companies, could alter or change the rates and certainly allow a greater rate. The Choctaw Coal & Railway Company right of way act of February 18, 1888, simply provided that the railway "shall not charge the **inhabitants of said territory** a greater rate of freight than the rate authorized by the laws of the state of Arkansas and Texas for services and transportation of the same kind." On May 2, 1890, Congress passed an act (26 St L. 81) known as the Ok-

lahoma Territorial Organic Act. Under that act approximately one-half of the then Indian Territory, the western half, and that part in which El Reno and Enid are located, became an organized territory with its local legislature, with authority to pass laws pertaining to all rightful subjects of legislation "not inconsistent with the Constitution and laws of the United States." The territory was given a Governor, with authority to exercise the executive powers; territorial courts were authorized and the territorial government had the power to tax property for the expenses of the territorial government, and, in short, the Oklahoma Territory became an organized political entity with the usual and customary powers, legislative, judicial, and executive, exercised by the various organized territories of the United States. What is now the state of Oklahoma constituted approximately Indian Territory prior to the Oklahoma Territorial Organic Act of May 2, 1890. The Indian Territory at that time was an unorganized Territory without any political entity, and controlled and governed by the United States, through the federal Congress and the Executive Department. After the territory of Oklahoma became an organized political entity, with certain legislative, executive, and judicial powers, all that part within the geographical limits of the remaining part of the Indian Territory—the part left after carving out the organized territory of Oklahoma—remained unorganized, subject to the legislative, executive, and judicial powers of the United States, to be exercised and administered under the direction of Congress. Section 3 of article 4 of the federal Constitution declares that "Congress shall have power to dispose of and make all needful rules and regulations respecting the territory or the property belonging to the United States." Under that section of article 4 of the federal Constitution, and the principles announced in United States v. Kagama, 118 U. S. 375, 30 L. Ed. 228, the United States possessed full sovereignty over the Indian Territory as a territory of the United States. Light v. United States, 220 U. S. 523: Gibson v. Choteau, 13 Wall. 92 ; Van Brocklin v. Tennessee, 117 U. S. 151 ; Hallowell v. United States, 221 U. S. 317 ; Tiger v. Western Investment Co., 221 U. S. 286. Neither the plaintiff nor his assignors were inhabitants of the Indian Territory, as that territory must be defined. at the time the shipments complained of were made. The shipments were transported from a place of origin within the Indian Territory to a place of destination in Oklahoma Territory. From its organization, Oklahoma Territory was just as separate and distinct from the Indian Territory as any other organized territory of the United States. The Oklahoma Territorial Organic Act of May 2 1890.

operated to cut the Indian Territory into two separate Territories, one organized and the other unorganized, and immediately and concurrently with the creation of the Territory of Oklahoma, the transportation of passengers and property by railroad "from * * * territory of the United States * * * to any other territory of the United States" fell under the jurisdiction of the Interstate Commerce Commission.

The creation of a new state or new territory did not confer any new abstract jurisdiction on the Interstate Commerce Commission ; the Interstate Commerce Act, however, was intended to lay hold of transportation from a territory to a territory, or from a state to a state, or from a territory to a state, or from a state to a foreign country or the District of Columbia, or a territory to the District of Columbia, without regard to the geographical boundary lines of the territories at the time it was passed. We therefore hold that the provisions of the Choctaw Coal & Railway Company Right-of-Way Act of February 18, 1888, prohibiting the railway from charging the inhabitants of the Indian Territory a greater rate of freight than authorized by the laws of the states of Arkansas and Texas for services and transportation of the same kind, were superseded, abrogated, and annulled by the Oklahoma Territorial Organic Act of May 2, 1890, in so far as shipments from the place of origin in the Indian Territory to points of destination in Oklahoma Territory are concerned.

The defendants complied with the provisions of the Interstate Commerce Act and filed with the Interstate Commerce Commission their tariff rates on shipments from the Indian Territory to points of destination in Oklahoma Territory. Whether the tariff rates filed were reasonable then became a question for the Interstate Commerce Commission. While it is well settled at common law that a carrier is liable in an action in court for damages on account of excessive charges, the jurisdiction of the courts to pass upon the reasonableness of rates and charges was superseded by the Commerce Act. The purpose of the Commerce Act was to bring about uniformity in freight rates. When a carrier filed its tariff with the commission, it then became a question for the commission to determine whether or not the charges were excessive. and it had jurisdiction to investigate that question and make an order of reparation. Uniformity in rates being one of the main purposes of the Commerce Act, it is obvious that no such uniformity could be maintained if the courts continued to exercise jurisdiction to determine the reasonableness or unreasonableness of the rates charged. No uniformity of rates could be maintained if their reasonableness was left to the fluctuating ver-

dicts of juries and the divergent views of respective courts, and this being true, the Commerce Act must be construed as operating to oust the courts of jurisdiction to pass on this question. See Texas & Pac. R. Co..v. Abilene Cotton Oil Co., 204 U. S. 440.

There being no allegation that the reasonableness of the tariff and schedule of rates filed with the Commerce Commission and charged the plaintiff and his assignors by the defendants had been passed upon and condemned by the commission, it is obvious that the plaintiff's petition did not state facts sufficient to constitute a cause of action. Then, besides, we cannot agree with the contention of plaintiff in his construction of section 4 of the Choctaw Coal & Railway Right-of-Way Act of February 18, 1888, prohibiting the railway from charging inhabitants of the territory "a greater rate of freight than the rate authorized by the laws of the state of Arkansas and Texas for services and transportation of the same kind." As stated, plaintiff contends that Congress, by reference to the laws of Arkansas and Texas, intended to limit the railway to the maximum charges allowed by the laws of Arkansas, if Arkansas' laws were less than those of Texas, or Texas rate if the Texas rate should be less than that of Arkansas. If section 4 can be applied, which we gravely doubt on account of its uncertainty, it seems just as clear that the railroad would have the right to charge the greater rate prescribed by either of said states; that is, if Texas prescribed a greater rate than Arkansas, the railway would have the right to adopt the Texas rate. But how do we know, or how could the railroad company know, which of the two rates is to be applied? It is just as reasonable to apply the high rate of Texas as to apply a lower rate of Arkansas, and while it is the duty of the court to sustain the validity of legislation unless it is so utterly uncertain that it cannot be applied nor its meaning ascertained, nevertheless, the uncertainty in this act, coupled with the fact that the Rock Island Railway also operated under a right-of-way act limiting its maximum charges to the rates prescribed by the laws of Kansas over that part of its road from El Reno to Enid, renders its working application to the facts in this case impossible. The overcharges sought to be recovered by the plaintiff were made on coal shipped from the McAlester and Wilburton coal fields in the Indian Territory over the Choctaw lines to El Reno, and thence over the Chicago, Kansas & Nebraska line, now owned by the Rock Island, to Enid. Plaintiff contends the Arkansas rates control, but they cannot control from El Reno to Enid, and there is neither allegation nor proof in this case showing what the overcharges amounted to from the coal fields in the Indian Territory to

El Reno. The Interstate Commerce Commission, in Haines v. Chicago, Rock Island & Pacific R. Co., 13 Interstate Commerce Rep. 216, discusses this very uncertainty in the act in an able opinion by Commissioner Lane, subsequently Secretary of the Interior. Commissioner Lane said:

"The Interstate Commerce Commission is a creature of statute, and its authority is derived from the act of Congress creating the commission and the various amendments thereto. Its function is to administer the act to regulate commerce; not to enforce conditions found in federal or other charters. And while a violation of the conditions of the acts of Congress granting the rights of way may be ground for forfeiture, the remedy would be through the courts.

"Moreover, the indefinite language of the legislation makes it impracticable to give application to its provisions. What certainty, for instance, is there in the provision that rates shall not be greater than are charged in three other state jurisdictions, when each of those states has a commission with authority to fix rates? Naturally, in the proper performance of their duties, these several commissions take into consideration in fixing rates on special commodities peculiar conditions incident to the transportation of the several commodities within their respective states. This statement makes it evident that the several standards could not be made the measure of rates in Oklahoma. Applying it to the particular case here under consideration, Kansas, Arkansas, and Texas have rates which are different for the transportation of coal for equal distances, and each of these commissions changes the rates within its jurisdiction whenever, in its judgment, the public interest requires.

"Again, the two rights of way here concerned were granted to separate and distinct corporations. In granting one right of way Congress provided that the rates should not be higher than prevailed in Kansas. In granting the other right of way it provided that the rates should not be higher than in Arkansas 'and' Texas. Since the passage of these acts, the two carriers have become consolidated into one system and are operated as a unit. In some of the instances complained of rates are made over the lines of what were formerly two carriers, but now one. Should it be held that the acts of Congress were to determine the rate, which would be the standard adopted—the Kansas, the Arkansas, or the Texas rate? And, if either were selected, could the rate in that state be applied over what was formerly two carriers?

"These are only a few of the insurmountable difficulties which would render it impracticable to give effect to the conditions under the acts of Congress referred to, even were we to hold that the provisions in such special acts conferred jurisdiction on this commission, a position legally untenable. The only

measure of the power of this commission is found in the act to regulate commerce, as amended."

It is unnecessary for us to consider the other questions discussed in the able briefs of counsel for the respective parties. In our opinion, the Interstate Commerce Commission Act of February 4, 1887, became the applicable law immediately upon the passage of the Oklahoma Territorial Organic Act of May 2, 1890. The Choctaw Coal & Railway Right-of Way Act, undertaking to limit the maximum freight charges to those prescribed by the laws of Texas and Arkansas, had served its purpose, became functus officio and no longer controlling with respect to shipments made from the Indian Territory to points of destination in the Oklahoma Territory. If not void for uncertainty (International Harvester Case, 234 U. S. 216; Andrew Jackson, Ex parte, 45 Ark. 158; Jones' Blackstone, book 1, sec. 127; Black on Interpretation of Laws, pages 75 and 105), the maximum rate prescribed by section 4 of the Choctaw Coal & Railway Right-of-Way Act was confined in its application to the Indian Territory after Oklahoma Territory was cut off and organized, and had no application to interterritorial shipments.

The judgment is reversed and the cause remanded to the district court of Garfield county, with directions to dismiss plaintiff's case at his cost.

RAINEY, C. J., and HARRISON, PITCHFORD, JOHNSON, and McNEILL, JJ., concur.