HILL, APPELLANT, v. RAE, STATE TREASURER, RESPONDENT.

(No. 3,870.)

(Submitted May 22, 1916.   Decided June 2, 1916.)

[158 Pac. 826.]

*Injunction—Farm Loan Act—Constitutional Law—Equal Protection of Laws—Appropriations—Lending Credit of State—Exemptions—Recordation Fees—Mortgages.*

Injunction—Taxpayer's Suit—District Court—Jurisdiction.
    1.   The district court had jurisdiction to hear, and a citizen and taxpayer could maintain, a suit to enjoin the state treasurer from issuing, negotiating or selling bonds pursuant to the provisions of the Farm Loan Act (Chap. 28, Laws 1915).

Constitutional Law—Equal Protection of the Laws—Discrimination.
    2.·  Within the meaning of the Fourteenth Amendment to the United States Constitution, a privilege conferred upon one class is a discrimination in favor of that class and against all others not similarly favored, as a burden upon one class is a discrimination against it and in favor of all others not similarly burdened.

    [As to the constitutional requirement of equal protection of laws, see note in 25 Am. St. Rep. 873.]

Same.
    3.   A privilege or a burden is or is not a denial of the equal protection of the laws, under the Fourteenth Amendment, *supra,* according to whether the discrimination relates to a matter upon which classification is legally permissible, and, if so, whether the classification is a reasonable one.

Same—Classification—To be Upheld, When.
    4.   If the classification adopted by the legislature in enacting a statute conferring a privilege is practical, it is not reviewable unless palpably arbitrary.

Same — Construction of Statutes — Wisdom of Legislation — Province of Court.
    5.   In determining the constitutionality of a statute, the supreme court may not concern itself with the accuracy or wisdom of the view entertained by the legislature in making it.

Farm Loan Act—Constitution—Equal Protection of the Laws.
    6.   *Held,* that the Farm Loan Act (Chap. 28, Laws 1915), in selecting the agricultural interests of the state as the beneficiary of its provisions to the exclusion of others, and in discriminating in favor of such farmers only who are able to offer a certain kind of security, thus excluding all those who have less desirable or no security at all, is not unconstitutional as denying the equal protection of the laws.

Same—Appropriations—Constitutionality.
    7.   Section 12, Article XII, of the state Constitution, forbidding appropriations for a longer term than two years, operates as an automatic limit, so that an unlimited appropriation as to time will expire at the end of two years, and is not void *ab initio.*

*Same—Appropriations—Separate Bills.*
8.  Where an appropriation is a mere incident to a larger, but single, subject of legislation—such as the creation of a Farm Loan Commission under Chapter 28, Laws of 1915, and providing funds for its inauguration and conduct—it need not be made by separate bill as otherwise required by section 33, Article V, of the Constitution.

*Same—Appropriations—Lending Credit of State—Constitution.*
9.  *Held*, that the provision of Chapter 28, Laws of 1915, appropriating $20,000 to serve as a guaranty fund to assure prompt payment of interest on farm loan bonds, is void under section 35 of Article V of the Constitution, because the funds thus appropriated are "not under the absolute control of the state," and under section 1, Article XIII, because by it the credit of the state is given as an assurance for the benefit of those who may become lenders under the Act.

*Statutes—Constitution—Partial Invalidity.*
10.  The insertion of a void provision in an Act otherwise valid does not render it inoperative as a whole unless the objectionable clause is indispensable to its operation or constituted the inducement to its enactment.

*Farm Loan Act—Fees—Exemptions—Power of State.*
11.  The state could properly exempt itself or its officers from the payment of recording fees on mortgages given under the Farm Loan Act.

*Mortgages—Recordation—Fees—By Whom to be Paid.*
12.  Recording fees are to be paid by those whose interests are protected by recordation—in case of mortgage, by the mortgagee.

*Farm Loan Act—Exemptions—Equal Protection of Laws.*
13.  Inasmuch as the exemption from payment of fee for recording the mortgage placed upon his land for a loan obtained under the Farm Loan Act is not for the benefit of the farmer—the borrower—but for that of the lender—the real mortgagee—the discrimination between the latter and all other mortgagees *held* to vitiate the Act so far as the exemption is concerned, under the equal protection of the law clause of the Constitution.

*Statutes—Constitutionality—Who may not Question.*
14.  One not prejudicially affected by unconstitutional clauses of a statute is not entitled to complain of its unconstitutionality.

*Appeal from District Court, Lewis and Clark County; R. Lee Word, Judge.*

SUIT by George H. Hill to enjoin William C. Rae, as State Treasurer of the State of Montana, from issuing, negotiating or selling bonds pursuant to the Farm Loan Act.  Judgment for defendant, and plaintiff appeals.  Affirmed.

*Messrs. Wight & Pew*, for Appellant, submitted a brief; *Mr. Chas. E. Pew* argued the cause orally.

In behalf of Respondent, there was a brief by *Mr. J. B. Poindexter*, Attorney General, *Mr. Wm. H. Poorman* and *Mr.*

*Chas. S. Wagner,* Assistant Attorneys General, and oral argument by *Mr. Poorman* and *Mr. Wagner.*

MR. JUSTICE SANNER delivered the opinion of the court.

The plaintiff, alleging his status as citizen and taxpayer of Lewis and Clark county, Montana, brought this suit to enjoin the defendant, as state treasurer, from issuing, negotiating or selling certain bonds pursuant to the provisions of Chapter 28 of the Laws of 1915, commonly called the Farm Loan Act. Claim to the relief sought is based upon the contention that the Act is unconstitutional, and that, in connection with the proposed issue, negotiation and sale of bonds thereunder, the defendant has expended, and, unless restrained, will expend, large sums of money belonging to the .state. The defendant demurred, questioning the plaintiff's main contention, his right to maintain the suit, and the power of the court to hear it. The demurrer was sustained, not, however, on either of the technical grounds assigned, and the plaintiff, refusing to plead further, suffered judgment of dismissal to be entered. This appeal is from that judgment.

1. The defendant again insists that the court had no jurisdiction to hear this suit, and the plaintiff none to maintain it—the former because "an injunction cannot be granted * * * to prevent the execution of a public statute, by officers of the law, for .the public benefit" (Rev. Codes, sec. 6121); the latter because it does not appear that the plaintiff will suffer any other or different injury than the taxpayers of the state in general. The assumption that the Farm Loan Act or its execution is for the public benefit begs the whole question; while the plaintiff's right as citizen and taxpayer to maintain such a suit as this is settled by a long line of decisions in this state, extending from *Chumasero* v. *Potts,* 2 Mont. 242, to *Poe* v. *Sheridan County,* 52 Mont. 279, 157 Pac. 185.

2. In its general scope and purpose the Farm Loan Act is assailed as obnoxious class legislation, or a denial of the equal protection of the laws, contrary to the Fourteenth Amend-

ment to the national Constitution. Whether this is so or not depends on what the Act designs to do, how it designs to do it, and what may be its effect upon those without as well as those within its scope. It may be analyzed as: (1) Creating a department of farm loans, for which the state treasurer is the commissioner or head, the several county treasurers are local representatives, the attorney general is the legal adviser, the state examiner is the auditor, and the several county attorneys are, as such, required to render legal service; (2) imposing upon that department the duty to formulate and receive applications for loans on nonurban property, to require and pass upon proof of title, productive value and other facts pertinent to the security offered, to formulate all mortgages given to secure such loans and be named as mortgagee therein, to formulate, issue and offer for sale the bonds intended as evidence of such loans, to collect all payments as they become due, and to pay the bonds as they mature according to the scheme set forth; (3) prescribing the character of property which shall be accepted as security and how it shall be held as such, the general nature of the bonds, the rate of interest they shall bear, how they shall mature, where they shall be payable, the manner in which payments shall be taken up, and the means to be employed in caring for cases of default; (4) appropriating $25,000 out of the state treasury, of which $5,000 is to be used for administrative purposes, but to be recouped, so far as may be, by taking one-eighth of each payment required of the mortgagors, and $20,000 to serve as a guaranty fund to assure the prompt payment of maturing bonds, with interest, and to be recouped by the proceeds of foreclosures against defaulting debtors, or, if necessary, by assessments upon nondefaulting owners whose mortgages are security for the same series of bonds; and (5) exempting from recording fees and from taxation the mortgages given to secure such loans. In short, for reasons not declared in the Act itself, it designs to assist agriculturists in securing loans on their real estate by and through the activities of a public department, aided to greater or less

extent by public funds, and thus to confer upon that particular class certain privileges not as yet enjoyed by any other.

In the application of the Fourteenth Amendment to the Constitution of the United States no distinction is to be observed between the effect of privileges conferred and the effect of burdens imposed. A privilege conferred upon one class is a discrimination in favor of that class and against all others not similarly endowed, as a burden upon one class is a discrimination against it and in favor of all others not similarly afflicted. But a discrimination is not necessarily unlawful merely because it is a discrimination. Indeed, the greater part of all legislation is discriminatory either in the extent to which it operates, the manner in which it applies, or the objects sought to be attained by it; and we are commanded by the highest judicial authority of the land "to be cautious about pressing the broad words of the Fourteenth Amendment to a dryly logical extreme. Many laws which it would be vain to ask the court to overthrow could be shown, easily enough, to transgress a scholastic interpretation of one or another of the great guaranties in the Bill of Rights." (*Noble State Bank* v. *Haskell,* 219 U. S. 104, Ann. Cas. 1912A, 487, 32 L. R. A. (n. s.) 1062, [3] 55 L. Ed. 112, 31 Sup. Ct. Rep. 186.) A privilege, or a burden, is or is not a denial of the equal protection of the laws, according to whether the discrimination relates to a matter upon which classification is legally permissible, and, if so, whether the classification is a reasonable one. That classification is permissible, because in the essential nature of things and in any due appreciation of equality in the operation of the law it is necessary in legislation for purposes of revenue, or in the application of the police power strictly so called, or in legislation designed to increase the industries of the state, develop its resources, or add to its wealth and prosperity, is abundantly settled by judicial decision as well as by the course of legislation. To cover the entire field of this subject is impossible within any reasonable limits. Suffice it to say that by the supreme court of the United States, construing this very amend-

ment, classifications have been sustained based upon differences in the amount of legacies, differences between corporations, differences between land dependent on its use for agricultural and other purposes, differences between fire insurance and other insurance, differences in the character of work, differences between hiring persons to labor in the state and hiring persons to labor out of the state, differences between sugar refineries based entirely on whether the sugar refined was purchased or produced by the refiner, as well as various other differences too numerous to mention. (*Magoun* v. *Illinois T. & S. Bank*, 170 U. S. 283, 42 L. Ed. 1037, 18 Sup. Ct. Rep. 594; *Clark* v. *Kansas City*, 176 U. S. 114, 44 L. Ed. 392, 20 Sup. Ct. Rep. 284; *Gundling* v. *Chicago*, 177 U. S. 183, 44 L. Ed. 725, 20 Sup. Ct. Rep. 633; *Petit* v. *Minnesota*, 177 U. S. 164, 44 L. Ed. 716, 20 Sup. Ct. Rep. 666; *Williams* v. *Fears*, 179 U. S. 270, 45 L. Ed. 186, 21 Sup. Ct. Rep. 128; *American Sugar Refining Co.* v. *Louisiana*, 179 U. S. 89, 45 L. Ed. 102, 21 Sup. Ct. Rep. 43, and cases cited in these decisions.)

In *Barbier* v. *Connolly*, 113 U. S. 27, 28 L. Ed. 923, 5 Sup. Ct. Rep. 357, Mr. Justice Field, speaking for the court, said: "Neither the amendment, broad and comprehensive as it is, nor any other amendment, was designed to interfere with the power of the state, sometimes termed its police power, to prescribe regulations to promote the health, peace, morals, education and good order of the people, and to legislate so as to increase the industries of the state, develop its resources, and add to its wealth and prosperity. From the very necessities of society, legislation of a special character, having these objects in view, must often be had in certain districts, such as for draining marshes and irrigating arid plains. Special burdens are often necessary for general benefits—for supplying water, preventing fires, lighting districts, cleaning streets, opening parks and many other objects. Regulations for these purposes may press with more or less weight upon one than upon another, but they are designed, not to impose unequal or unnecessary restrictions upon anyone, but to promote, with as little individual incon-

venience as possible, the general good.   Though in many respects necessarily special in their character, they do not furnish just ground of complaint if they operate alike upon all persons and property under the same circumstances and conditions.''

In *Clark* v. *Kansas City, supra,* a state statute was under consideration which authorized certain cities to annex lands adjoining the city limits, but provided that ''nothing in this Act shall be taken or held to apply to any tract or tracts of land used for agricultural purposes when the same is not owned by any railroad or other corporation,'' and the court upheld the distinction, declaring that it was justified by the principle of the cases cited above: ''That principle leaves to the state the adaptation of its laws to its conditions.   The growth of cities is inevitable, and in providing for their expansion it may be the judgment of an agricultural state that they should find a limit in the lands actually used for agriculture.''

In *American Sugar Refining Co.* v. *Louisiana, supra,* a state statute imposing a license tax upon persons and corporations carrying on the business of refining sugar and molasses, but exempting from its operation ''planters and farmers grinding and refining their own sugar and molasses,'' was sustained with the remark that: ''The discrimination is obviously intended as an encouragement to agriculture, and does not deny to persons and corporations engaged in a general refining business the equal protection of the laws.''

So, too, legislative activity having for its avowed purpose the encouragement of this or that particular industry deemed of importance to the state has been prolific of results.   We need not go beyond the boundaries of our own commonwealth for instances which now form part and parcel of our very political and economic life.   We cite the state board of stock commissioners, the state board of sheep commissioners, and the livestock sanitary board, specifically charged with the supervision and protection of the stock interests of the state, together with the considerable mass of legislation enacted to foster this industry; the state board of horticulture, with the laws for the

prevention and eradication of insect pests and plant diseases, distinctly held by this court to be a vaild exercise of the power vested in the state to promote the general welfare (*Colvill* v. *Fox*, 51 Mont. 72, 149 Pac. 496) ; the bureau of agriculture and publicity and the bureau of labor and industry, whose functions are to further, in certain ways, "the agricultural, commercial, mining, manufacturing and labor interests of the state"; the state fair; our extensive Code of labor statutes, including the regulations for mining, and the laws for the compensation of injured workmen; the state board of poultry husbandry; the maintenance of experiment stations, substations and county agriculturists; our provisions for the organization of irrigation and drain districts; and, in part, the institution and maintenance of the Agricultural College and the School of Mines themselves. In the face of all that has been said and done in this connection, it is too late to claim that the mere selection of a given industry or pursuit for favorable consideration by the state is a denial to others of the equal protection of the law.

Plaintiff urges as decisive against the Act that in *State* v. *Cudahy Packing Co.*, 33 Mont. 179, 114 Am. St. Rep. 804, 8 Ann. Cas. 717, 82 Pac. 833, this court, following the decision of the national supreme court in *Connolly* v. *Union Sewer Pipe Co.*, 184 U. S. 540, 46 L. Ed. 679, 22 Sup. Ct. Rep. 431, held an anti-trust law of this state to be invalid as a denial of the equal protection of the laws because, though forbidding persons, corporations and associations generally from combining to fix prices, regulate production or create restrictions in trade, it exempted from its operation "persons engaged in horticulture or agriculture with a view of enhancing the price of their products." The idea underlying both these decisions is that if, in the large design to protect the public from extortion, combinations to control prices should be forbidden, all should be, because, with reference to that design, no legitimate distinction can be made among them. This is apparent from the fact that in the *Connolly Case* the court, reasserting the right of the states to classify, insists that classification "must always rest

upon some difference which bears a reasonable and just relation to the Act in respect to which the classification is proposed."
[4] It does not follow, however, that the object in respect to which the classification is made must commend itself to "certain preconceived and deeply rooted notions of lawyers" (Cunningham v. Northwestern Imp. Co., 44 Mont. 180, 204, 119 Pac. 554), or that the classification must always depend "on scientific or marked differences in things or persons or relations; it suffices if it is practical, and it is not reviewable unless palpably arbitrary." (Orient Ins. Co. v. Daggs, 172 U. S. 557, 562, 43 L. Ed. 552, 19 Sup. Ct. Rep. 281.)

The question then is whether, within the lines thus drawn, [5, 6] the selection of agriculturists for the particular form of consideration here accorded can be justified. We think it can, bearing in mind that with the accuracy or wisdom of the legislative view we may not concern ourselves. (Mobile County v. Kimball, 102 U. S. 691, 26 L. Ed. 238; Magoun v. Illinois T. & S. Bank, supra; Atchison, T. & S. F. R. R. Co. v. Matthews, 174 U. S. 96, 102, 43 L. Ed. 909, 19 Sup. Ct. Rep. 609; Clark v. Kansas City, supra; Billings v. Illinois, 188 U. S. 97, 102, 47 L. Ed. 400, 23 Sup. Ct. Rep. 272.) It is a matter sufficiently notorious to charge the court with judicial knowledge that, according to the federal census of 1910, approximately one-third of our productive population is engaged in agriculture. From time immemorial it has been fully realized that the economic relations of that pursuit to all other forms of human activity are of the first importance; other things, other occupations, may be dispensed with at more or less cost to society, but without agriculture, civilization itself must fail. For several years last past there has been growing the conviction, based to some extent on government investigations and reports, that farmers requiring money to carry on and extend their operations are subjected to disadvantages which, not altogether necessary and not suffered by other classes, seriously hamper, if they do not imperil, the progress and welfare of agriculture. The rectification of this condition has engaged and is engaging the at-

tention of Congress as well as the attention of several of the states. At the general election of 1914 the people of this state undertook to aid in the solution of the problem by means of the initiative, authorizing farm loans to be made out of the school funds, and the governor in his annual message to the Fourteenth Legislative Assembly directing notice to certain constitutional objections which had been raised against such use of school funds, urged the subject of farm loans upon the legislative mind. In the light of these circumstances it is impossible to avoid the conclusion that the subject appeared to be one "held by the strong and preponderant opinion to be greatly and immediately necessary to the public welfare" (*Noble State Bank* v. *Haskell, supra*), and that, whether wisely or not, the legislature, in enacting the law in question, did believe that it was legislating to develop the resources of the state and to add to its prosperity. It is not our province to assert that this was a mistaken belief.

It is urged, however, that the Act is unequal, even as respects the agricultural class, because farmers who have only chattel security and farmers who have no security cannot avail themselves of its provisions. This argument mistakes the purpose of the Act; for it surely is not sound criticism that such purpose was not to further improvidence nor to furnish a panacea for all the financial ills to which the farmer, like the most of us, is heir. The legislative view undoubtedly was that the capital necessary to enlarge and develop our productive area could best be acquired by individual long-time loans at a moderate rate of interest. But to every lender, particularly to the makers of such loans, assurance of repayment with interest is a commanding factor; and the Act cannot be condemned because it does not attempt the impracticable task of procuring long-time loans at moderate interest on chattel security or on no security at all. In our opinion, the Act is general so far as it goes, because the conditions of security exacted by it are adapted to the character of loans which its aid is offered to obtain, and because such aid is open to all who comply with these conditions.

We see nothing in the general scope and purpose of the Act which constitutes a denial of the equal protection of the laws.

3. Because of the appropriation it contains, the Act is fur-[7] ther assailed as contrary to sections 33 and 34 of Article V, section 12 of Article XII, and section 1 of Article XIII of our state Constitution.

Conceding that the appropriation is not limited in terms as to time, it is our opinion that the provision in section 12, Article XII, forbidding appropriations for a longer term than two years, operates as an automatic limit, so that the appropriation, if otherwise valid, would expire at the end of that time, rather than to void it *ab initio*.

Nor do we think there was any violation of section 33, Article [8] V, which provides that appropriations, other than for the ordinary expenses of the legislative, executive and judicial departments of the state, interest on the public debt, and for public schools, ''shall be made by separate bills, each embracing but one subject.'' Counsel for appellant construes this to mean that appropriations for a special purpose shall in all cases be made by a bill containing nothing but the appropriation itself. Where the appropriation constitutes the entire purpose in view, this is doubtless correct; but it is not correct if the appropriation is a mere incident to a larger, but still single, subject of legislation. There is no violation of this provision where the legislature establishes a bureau or commission, and appropriates funds for its inauguration or to carry out the objects for which it was created.

''No appropriation shall be made,'' says section 35 of Article [9] V, ''for charitable, industrial, educational or benevolent purposes to any person, corporation or community not under the absolute control of the state,'' and, says section 1 of Article XIII, ''neither the state, nor any county, city, town, municipality, nor other subdivision of the state shall ever give or loan its credit in aid of, or make any donation or grant, by subsidy or otherwise, to any individual, association or corporation.'' The appropriation in this Act has two defined purposes, *viz.:*

Five thousand dollars to set in motion the department created by the Act, to which extent it cannot be assailed as contravening the provisions quoted; and $20,000 to serve as a guaranty fund to assure lenders that the interest on maturing bonds will be promptly met, whether the mortgagors have made their payments or not. Manifestly, this sum of $20,000 is both an appropriation and a credit assurance; for it is no longer available as a part of the public funds, and it is set apart as a guaranty fund to be drawn upon to make good *pro tempore* the defaults of mortgagors. It will not suffice to say that, the general purposes of the Act being to foster agriculture, and thus to promote the public welfare, such purpose is a public one; in the broad sense considered above it is so, and so, likewise, are all the purposes mentioned in section 35 of Article V; yet money for them may not be appropriated unless the specific objects are under the absolute control of the state. The ultimate purpose of the Farm Loan Act comes fairly within the term "industrial," as used in section 35 of Article V; but it is not, so far as the use of this fund is concerned, under the absolute control of the state, for the obvious reason that the state cannot direct the conduct or judgment of mortgagors in the handling of their property, nor anticipate or prevent the cases of default which are to be the occasion for such use. Nor does the fact that the fund is to be recouped as used, save it from the ban of the Constitution, because, whether used or not, it stands as an appropriation and an assurance for the benefit of the individuals who may become lenders under the Act. (*In re Relief Bills,* 21 Colo. 62, 39 Pac. 1089; *Fox* v. *Mohawk etc. Soc.,* 165 N. Y. 517, 80 Am. St. Rep. 767, 51 L. R. A. 681, 59 N. E. 353.)

It does not follow, however, that the Act itself must fall. [10] There is nothing to indicate that any part of this $20,000 has ever been used or that its presence in the Act was the inducement to its passage. A statute solemnly enacted is not to be overthrown by anything short of positive conviction of its illegality, and it is not destroyed *in toto* because of an improper provision, unless such provision is necessary to the integrity

of the statute or was the inducement to its enactment. It is perfectly clear that this Act can be carried out without the unlawful provision, while it is pure speculation whether the loss of the unlawful appropriation will in the slightest degree affect its serviceability.

4. The last and final assault upon the Act is based upon the [11–13]   provision exempting from taxation and recording fees the mortgages to be given pursuant to its terms.  So far as the exemption from taxation is concerned, the Act creates no real distinction between these and other mortgages.  Mortgages are not now taxed save as the notes, bonds or other choses in action secured by them are taxed; and it is so here.  The bonds are to be taxed, and, because they are to be taxed, the mortgages are not.

It is not difficult to understand the theory upon which the exemption from recording fees was made.  By the terms of the Act the mortgages are to run to the commissioner of farm loans, and the state may clearly exempt itself and its officers from paying such fees.  It happens, however, that the commissioner of farm loans is only a nominal mortgagee, made so for convenience, the real mortgagees being the holders of the bonds secured by the mortgages.  It is the contemplation of our law, whatever may be the commercial custom, that recording fees are to be paid by those whose interests are protected by recordation,—in case of mortgage the mortgagee.  It is never legally a charge against the mortgagor, and exemption from it is not for his benefit.  This exemption, therefore, furthers the interests neither of the farmer —the mortgagor—nor of the state; but, being for the sole benefit of the lender, the discrimination between him and all other mortgagees is not justified by any such relation to the encouragement of agriculture or any public purpose as would warrant the upholding of the exemption.  It must be said again, however, that the Act itself is not involved in the condemnation of this provision, because it is not so interwoven with the texture of the Act, so indispensable to the purposes or operation of the Act as to

compel the view that without the provision the Act would not have been passed.

The bonds proposed to be issued, as shown by a form copy **[14]** attached to the complaint, contain various references to the $20,000 appropriation as a guaranty fund; and it follows from the above discussion that they ought not, as a matter of fair dealing, to be issued in that form, because there is no such appropriation, legally speaking. Of this, however, the plaintiff cannot complain, since, whether these references remain in the bonds or not, they can have no force or effect prejudicial to him. Nor can he be affected by the invalid exemption from recording fees, because the several county recorders are responsible for their collection. He was therefore not entitled to the injunction sought, and the judgment appealed from was correct. It is accordingly affirmed.

*Affirmed.*

MR. CHIEF JUSTICE BRANTLY and MR. JUSTICE HOLLOWAY concur.