THE PEOPLE OF PUERTO RICO, Plaintiff, *v.* RUBERT HERMANOS, INC., Defendant.*

No. 2. Argued April 23, 1938.—Decided July 30, 1938.

* NOTE.—A judgment of the U. S. Circuit Court of Appeals for the First Circuit (106 F. (2d) 754) reversing this decision, was reversed, on certiorari, by the Supreme Court of the United States (309 U. S. 543)

742

P. Fernández García, Attorney General, M. Guerra Mondragón, R. Rivera Zayas, and Lester P. Schoene for plaintiff. Jaime Sifre, Jr., Horacio Franceschi, and Orlando Antonsanti for defendant.

MR. JUSTICE TRAVIESO delivered the opinion of the court.

The purpose of the present *quo warranto* proceeding is to try the right and title of the defendant "Rubert Hermanos, Incorporated," to continue to do business as a corporation, in the Island of Puerto Rico. The material facts, as alleged in the amended complaint of the People of Puerto Rico, are as follows:

Rubert Hermanos, Incorporated, is a corporation organized under the laws of Puerto Rico, whose articles of incorporation, filed on April 27, 1927, provide as follows:

"Section 4.—The ends and purposes for which and for any of which the corporation is formed and organized are to carry out all or any of the things hereinafter mentioned equally and to the same extent as natural persons might do, to wit:

"(a) To engage in the Island of Puerto Rico or elsewhere in the manufacture of sugar, molasses and other by-products derived from sugar.

"* * * * * * *

"(c) To erect, purchase, possess, lease or otherwise acquire, and to develop, promote, organize, operate, direct and manage enterprises the end and purpose of which shall be the planting, cultivation and cropping of sugar cane and the manufacture and sale of sugar, refined as well as raw, molasses and other by-products derived from sugar, and to construct, purchase, possess or otherwise acquire centrales, grinding mills, establishments and factories with all the buildings, installations, dependencies, accessories and implements that may be necessary or convenient for the manufacture and preparation of sugar, molasses and by-products from sugar. . . .

"(d) . . . . To engage in agriculture in general. To plant, cultivate and harvest sugar cane, exploiting in such manner or in any other it may deem convenient, by the use of fertilizers and irrigation, either directly or through lessees or croppers (*colonos*), the lands that it may possess; to purchase, sell and otherwise deal in sugar cane. . . .

"(f) To purchase, take on lease, possess or otherwise acquire, sell, exchange and transfer or otherwise dispose of real property, rights in the realty, estates and plantations situated in or outside of the Island of Puerto Rico as far as it may be reasonably necessary to make possible the carrying out of the ends and purposes for which the corporation is formed and organized; *provided, however, that the right of the corporation to own and control lands in the Island of Puerto Rico shall be limited to five hundred acres only, and shall be subject to the restrictions provided in article three of the Joint Resolution of May 1, 1900, approved by the Congress of the United States of America.*" (Italics ours.)

The complaint charges that in violation of the foregoing provisions of its articles of incorporation and of article 3 of Joint Resolution No. 23 (31 Stat. 716, U. S. C. A., title 48, section 752) the defendant corporation has acquired and is now the owner with full dominion title of several tracts of land with a total area in excess of five hundred acres, which lands are used by said defendant corporation for planting, cultivating and harvesting sugar cane; and that the lands so owned, controlled and used by the defendant corporation have a total area of 12,188 acres.

The complainant prays for judgment declaring the defendant's charter forfeited, ordering the immediate dissolution

of the defendant corporation, enjoining it from doing any further business in Puerto Rico and imposing upon said defendant the payment of a fine, with such other further remedies as in equity and justice may be deemed proper.

A motion to strike out certain parts of the amended complaint, filed March 16, 1937, and a demurrer filed on the same date having been overruled by this court on July 13, 1937, the defendant corporation filed its answer to the complaint on August 19, 1937.

The defendant's answer, which is in effect a plea in confession and avoidance, sets up the following specific defenses:

1. Defendant admits that it was incorporated for the purposes, among others, of engaging in agriculture, planting canes, owning, purchasing and possessing lands and plantations; but it alleges, that the aforesaid are not all of the ends and purposes for which it was incorporated and that by its articles of incorporation the defendant company was also authorized to engage in the manufacture of sugar, molasses and other by-products derived from sugar cane and to buy, sell and generally deal in sugar and its by-products.

2. That the five hundred acres limitation referred to in paragraph (f) of section 4 of defendant's articles of incorporation and provided by section 3 of the Joint Resolution of May 1, 1900, is applicable only in case the defendant corporation should desire to engage in "agriculture," as its principal object; and that the other restrictions of said Joint Resolution to which reference is made are applicable to the defendant corporation in carrying out its object or manufacturing sugar, which is an industrial purpose, and said restrictions prohibit the defendant from owning or possessing real property, except such as may be reasonably necessary to carry out the purposes for which the company was organized.

3. That from among the various objects for which it was organized and for which it was authorized by its articles of incorporation, the defendant corporation chose as its prin-

cipal object the industry of manufacturing and producing sugar and molasses to be sold in the Island and in the United States, for which purpose it acquired the sugar factory known as "Central San Vicente," which has been equipped to grind up to 350,000 tons of cane per industrial year; that for the purpose of obtaining and securing the raw materials which are indispensable to enable it to engage in the manufacture of sugar, the defendant corporation, in the exercise of one of its incidental or implied powers, acquired also the lands reasonably necessary to obtain from them, by means of the planting and cultivation of sugar cane, part of the sugar cane which it needs each season for the industry of manufacturing sugar and molasses; that the lands so acquired do not supply all of the cane needed by the defendant's mill each season; that defendant would not be able to engage in the manufacture of sugar if it had to depend entirely on the cane which it might buy from others; that in order to operate its sugar manufacturing business economically and efficiently, the defendant company must raise and supply a large part of the cane to be ground each season, and that the lands which it now owns are those indispensably and reasonably necessary for the production of part of the raw material needed by it; and that in doing the aforesaid things, the defendant has not in any way violated its franchise nor any provision of the Joint Resolution of May 1, 1900.

4. Defendant admits that it owns and controls 12,188 acres of land; but it denies being engaged in agriculture upon the said lands, as its principal corporate end or object. It alleges, in opposition, that part of said lands are used for the cultivation and production of the cane needed by the defendant corporation for the manufacture of sugar and molasses, which manufacture is the principal end or object of the defendant corporation and in which .it has been engaged since it commenced to do business.

5. Defendant denies that the ownership or control by it of such large acreage of land is contrary to any public policy

of the People of Puerto Rico, and it further denies that such ownership or control is in conflict with the economic welfare of the people of the Island.

6. That the Joint Resolution restricting the ownership or control of lands by corporations was approved by Congress in the year 1900; that since that time and until recently several corporations have been organized in Puerto Rico for the purpose of engaging in the business of manufacturing sugar and many of said corporations acquired lands in excess of five hundred acres for the purpose of obtaining from said lands the cane necessary for the manufacture of sugar and molasses; that the People of Puerto Rico tolerated, permitted and encouraged the development of the sugar industry through all those years, without ever starting any proceedings to challenge or question the right of a sugar corporation to own or control more than five hundred acres, whenever the ownership or control of such lands should be reasonably necessary for the production of the cane required for the manufacture of sugar; that the People of Puerto Rico has collected and still collects taxes upon the properties of said corporations and that through its officers, departments and other governmental agencies always had or could have had knowledge of the lands acquired by those corporations so engaged in the manufacture of sugar; and that notwithstanding those facts it was not until the year 1935 that the People of Puerto Rico for the first time instituted proceedings to challenge the right of said corporations to hold more than 500 acres of land for the aforesaid industrial purposes.

7. That the defendant corporation acquired the central or sugar mill and almost all of the lands which it now owns or controls, in the year 1927; that since that date it has used said mill and lands in the business of manufacturing sugar and molasses, obtaining from said lands part of the cane required for its said sugar manufacturing business; that during all that time the defendant has acted openly and publicly, having all of said lands recorded in its corporate

name in the registries of real property of Puerto Rico and paying to the Government all taxes levied upon its properties, without the Government of Puerto Rico having ever objected to the business of the defendant corporation or against its ownership and control of more than 500 acres of land, until the present proceedings were instituted; and that by reason of its acquiescence and of its delay in bringing this action, the complainant is estopped from claiming the forfeiture of the defendant's corporate charter.

At the trial held March 7, 1938, the Attorney General of Puerto Rico argued on behalf of the complainant that the defendant's answer virtually admitted all the principal allegations of the complaint and that the only issue of fact presented by the pleadings was the denial by the defendant of the allegations of the complaint to the effect that the ownership and control by the defendant corporation of such large acreage of land is contrary to the long established and frequently announced public policy of the People of Puerto Rico and conflicts with the economic welfare of the people of the Island.

In support of its said allegations the complainant offered in evidence: (1) Volume 33 (Parts 1, 2, 3, 5 and 8) of the Congressional Record, containing the debates on Joint Resolution No. 23 of May 1, 1900, for the purpose of establishing the public policy which the Congress intended to put in practice in Puerto Rico by the passage of said resolution; (2) the 30th and the 31st Annual Reports of the Governor of Puerto Rico to the Secretary of War, dated, respectively, August 21, 1930, and September 1st, 1931, for the purpose of establishing the public policy of the People of Puerto Rico relative to the ownership and control by corporations of large areas of land; (3) the Annual Report of the Secretary of the Interior of the United States for the fiscal year 1937 (pages 327 to 330); (4) the opinions and decisions of the Supreme Court of Puerto Rico in the cases of *Compañía Azucarera de la Carolina* v. *Registrar*, 19 P.R.R.

143, *Compañía Azucarera del Toa* v. *Registrar*, 19 P.R.R. 724, *La Isabela Grove, Inc.* v. *Registrar*, 24 P.R.R. 240, *The Porto Rican Leaf Tobacco Co.* v. *Registrar*, 24 P.R.R. 245, and *Baetjer* v. *Registrar*, 48 P.R.R. 627; (5) the resolution of the Pubic Service Commission of Puerto Rico in the matter of the petition filed by the United Porto Rican Sugar Company for a franchise to take waters from the Humacao River for irrigation, appearing in the Commission's Annual Report to the Governor, for the year 1930–1931, pages 177 to 186; (6) Act No. 33 of the Legislative Assembly of Puerto Rico, approved July 22, 1935; (7) Act No. 47, approved August 7, 1935; (8) Act No. 45, approved August 7, 1935; Act No. 44, approved August 6, 1935; (9) Concurrent Resolution of the Legislative Assembly of Puerto Rico, passed February 13, 1935; all of which documents were admitted over the objection of counsel for the defendant, whose exceptions were noted.

The complainant also offered in evidence: (*a*) Census of Puerto Rico for the year 1935, taken by the Puerto Rico Reconstruction Administration and published by the Government Printing Office, Washington, 1937; (*b*) Report on "The Agricultural Problems of Puerto Rico," by Rafael Picó, Professor at the University of Puerto Rico and Adviser to the Puerto Rico Reconstruction Administration, dated May 18, 1936; (*c*) Report of Farr & Co., sugar brokers; (*d*) Monograph entitled "Types of Agricultural Exploitation in Puerto Rico," published by the College of Agriculture and Mechanical Arts of the University of Puerto Rico, November 1935; (*e*) Table No. 4, page 8, Census of Puerto Rico, 1935, by P.R.R.A.; (*f*) "Report on the Sugar Industry in relation to the social and economic system of Puerto Rico," by Esteban A. Bird, Chief Economic Research Section of the Puerto Rico Reconstruction Administration, January 23, 1937. The admission of said documents was duly objected to and exception taken as to each of them by counsel for the defendant.

At the close of complainant's case the defendant made a motion to dismiss the complaint. And said motion having been denied, the defendant rested without introducing any evidence in support of its special defenses.

 We have no doubt as to the admissibility or pertinence of the evidence introduced by the complainant. Most of said evidence consists of statistical facts and legislative history of which the courts may and should take judicial notice when specifically brought to their attention. See: Section 36, par. 8, Law of Evidence of Puerto Rico; *City Bank Farmers' Trust Co. v. U. S.,* 74 F. (2d) 692; *Ponce v. Roman Catholic Apostolic Church in Puerto Rico,* 210 U. S. 296, 52 L. ed. 1068; *Monk v. Ehert,* 219 Pac. 452, 192 Cal. 186; *Chicago R. 1. & P. Ry. Co. v. Gist,* 190 P. 878, 79 Okl. 8; *James v. Kuhn,* 8 P. (2d) 526, 121 Cal. App. 69; *Fortinberry v. State,* 283 S. W. 146; *Ex Parte Lewis,* 135 So. 147, 101 Fla. 624; *U. S. v. Payne,* 264 U. S. 446, 68 L. ed. 782; *Greene County v. Lydy,* 172 S. W. 376, 263 Mo. 77; *Miller v. U. S.,* 47 F. (2d) 424; *Fidelity Union Trust Co. v. Reeves,* 98 N. J. Eq. 412; *Grimmer v. Tenement House Department of the City of New York,* 204 N. Y. 370; *Hill v. Rae,* 158 P. 826, 52 Mont. 378, L. R. A. 1917-A 495; *Jasper County Farm Bureau v. Jasper County,* 286 S. W. 381, 315 Mo. 560; *Frost v. Corporation Commission of Oklahoma,* 26 F. (2d) 508, reversed (1929) 278 U. S. 515, 73 L. ed. 483; *Sligh v. Kirkwood,* 237 U. S. 52, 59 L. ed. 835; *Tolfree v. Wetzler,* 25 F. (2d) 553.

The following is a resumé of the historical facts, records, and statistics to which our attention has been called.

Puerto Rico has a total area of 3,435 square miles, equivalent to 2,198,400 acres, of which only 1,222,284 are tillable. The population of the Island in 1898, when Puerto Rico was ceded to the United States, was 953,243 inhabitants. The total area of land devoted to the cultivation of sugar cane was at that time 70,000 acres.

The Congressional debates in the year 1900, during the discussion of the bill to impose 25 per cent of the Dinley Tariff on all goods imported from Puerto Rico into the United States and viceversa and of the Organic Act (Foraker Law) for the establishment of a civil government in Puerto Rico, reveal the foresight of those members of Congress who expressed the fear that free trade between Puerto Rico and the United States would make the Island too attractive for the investment of large amounts of capital in sugar and tobacco, with the probable result of placing most if not all of the tillable soil of the Island under the ownership and control of the sugar and tobacco trusts. This fear was intensified by the fact that the year before, in 1899, the Island had been devastated by a cyclone, with the consequent loss of crops, and depreciation and mortgaging of its best lands. To prevent the development of an agrarian monopoly which would own and control the best lands of this small and densely populated Island and which might eventually convert the Island into a large sugar factory, served by a half-slave proletariat and to encourage the division of lands into small tracts, owned, controlled and cultivated by their owners, the Congress enacted Joint Resolution No. 23, approved May 1, 1900, section 3 of which provides as follows:

"Section 3.— . . . No corporation shall be authorized to conduct the business of buying and selling real estate or be permitted to hold or own real estate except such as may be reasonably ncessary to enable it to carry out the purposes for which it was created, and every corporation hereafter authorized to engage in agriculture shall by its charter be restricted to the ownership and control of not to exceed five hundred acres of land; and this provision shall be held to prevent any member of a corporation engaged in agriculture from being in any wise interested in any other corporation engaged in agriculture. Corporations, however, may loan funds upon real estate security, and purchase real estate when necessary for the collection of loans, but they shall dispose of real estate so obtained within five years after receiving the title. Corporations not organized in Porto Rico, and doing business therein, shall be bound by the provisions of this section so far as they are applicable."

From the Middle Ages to the present days sovereigns and parliaments have considered it their duty to protect their subjects and citizens against attempts by large combinations of capital to monopolize the lands adapted to agriculture, which are the basic source of wealth of any community. Numerous are the statutes and precedents which might be cited in support of the validity and wisdom of legislation enacted for the purpose of enforcing such an agrarian policy. The Statutes of Mortmain in England and the legislation of Spain might be cited as precedents. The Congress of the United States, in order to protect the people of the unincorporated Territories, enacted laws prohibiting the holding of lands by corporations in excess of 5,000 acres, even though some of those Territories had areas of 100,000 and 200,000 square miles. See 24 Stat. L. 476, First Supplement to Rev. Stats. of U. S., 2nd ed., p. 556, amended by the Act of March 9, 1888, 25 Stat. L. 45, First Supp., p. 582. See also *McQuaide* v. *Enterprise Brewing Co.,* 14 Cal. App. 315, 111 Pac. 927; *Commonwealth* v. *Railway Co.,* 132 Penna. 591, 19 Atl. 291; *Ronaldson & P. Co.* v. *Bynum,* 122 La. 687, 48 So. 152; *Jackson* v. *Western Union Tel. Co.,* 269 Fed. 598; *Shelby* v. *Hummel,* 266 U. S. 633, 69 L. ed. 479; *Commonwealth* v. *N. Y. L. R. & W. R. Co.,* 114 Pa. St. 340, 7 Atl. 756; *Late Corporation of the Church, etc.* v. *U. S.,* 136 U. S. 1, 34 L. ed. 481; *Trustees of the Catholic Church* v. *Manning,* 72 Md. 116, 19 Atl. 599; *House of Mercy* v. *Davidson,* 90 Tex. 529, 39 S. W. 924; *In Re Hood Realty Co.,* 2 F. (2d) 334; *In Re McGraw Estate,* 11 N. Y. 66, affirmed, 136 U. S. 152; Washburn on Real Property, 6th ed., sections 134 and 135; 4 Thompson on Corporations, 3d ed., sections 2451 and 2475; Tiffany on Real Property, sec. 504.

In the year 1917 the subject of the limitation of lands that may be legally owned or controlled by corporations in Puerto Rico was again debated by the Federal Congress. The pro-

hibition was re-enacted and incorporated into the new Organic Law, known as the "Jones Act," as follows:

"Section 39.— . . . . .

"That nothing in this Act contained shall be so construed as to abrogate or in any manner impair or affect the provision contained in section three of the Joint resolution approved May first, nineteen hundred, with respect to the buying, selling, or holding of real estate. That the Governor of Puerto Rico shall cause to have made and submitted to Congress at the session beginning the first Monday in December, nineteen hundred and seventeen, a report of all the real estate used for the purposes of agriculture and held either directly or indirectly by corporations, partnerships, or individuals in holdings in excess of five hundred acres."

The wisdom and foresight of the sponsors of the insular agrarian policy embodied in the above-mentioned federal legislation, has been demonstrated by the subsequent events. Puerto Rico, whose density of population in 1900 attracted the attention of Congress, has since then almost doubled the number of its inhabitants, the census of 1935 taken by the Puerto Rico Reconstruction Administration, a federal agency, showing that the Island had on that date a population of 1,723,534 inhabitants or an average of 501 persons per square mile; that 72.3 per cent of said population lives in the rural zone and depend entirely on agricultural activities for their subsistence; that the Island has an average of something less than one acre of tillable land per rural inhabitant; that there are 251,000 acres, that is one-fifth of all the lands adapted to agriculture; used for the production of sugar cane; that not less than 196,757 acres, or something more than 70 per cent of the total acreage planted to sugar cane, are owned or controlled by companies which in turn are controlled almost exclusively by absentee stockholders; that the companies so organized and controlled produce, normally, 59 per cent of the total sugar output of the Island, thus controlling almost 40 per cent of the total insular agricultural wealth; and that during the decade from 1920 to 1930 the

combined acreage of all the rural estates managed by their owners was decreased by 318,232 acres, while the total acreage operated under strange management was increased by about 325,425 acres.

This court must necessarily take judicial notice of all the foregoing facts, which constitute the elements of the most intricate problem confronting the people of this island. And we must agree with counsel for the complainant in that the existence of large land-holdings in a small agricultural country, abnormally overpopulated and without basic industries other than those required for the preparation of agricultural products for the market, is contrary to the economic welfare of its people.

In the year 1935, the Legislative Assembly of Puerto Rico. inspired by a desire to cooperate with the National Administration in the development of its plans for the economic reconstruction of the Island, enacted several statutes, the common purpose of which is to provide the necessary remedial measures for curbing the existing land monopolies and preventing further violations of the provisions of the Organic Act, *supra*. The said statutes are:

1. Act No. 33, approved July 22, 1935, which confers to the Supreme Court of Puerto Rico exclusive original jurisdiction to take cognizance of all *quo warranto* proceedings for violations of the provisions of section 752, title 48, U. S. C. A., and provides that the violation of said provisions shall constitute sufficient cause to institute a proceeding of the nature of *quo warranto*. (Laws of 1935, Special Session, page 418.)

2. Act No. 44, approved August 6, 1935, which provides that private property may be taken or destroyed "to carry out and develop any general plan of economic reconstruction for the general benefit of the insular community, implanted by The People of Puerto Rico or by the Government of the United States . . . and specially for the redistribution or division of lands concentrated in large estates, or for the

establishment of public centrals or factories for the manufacture of sugar or for any industry or activity." (Laws of 1935, Special Session, page 508.)

3. Act No. 47, approved August 7, 1935. The pertinent provisions thereof read as follows:

"Section 1.—Section 2 of An Act entitled 'An Act establishing Quo Warranto proceedings,' approved March 1, 1902, is hereby amended as follows:

" 'Section 2.— . . . ; or whenever any corporation, by itself or through any other subsidiary or affiliated entity or agent exercises rights, performs acts, or makes contracts in violation of the express provisions of the Organic Act of Puerto Rico or of any of its statutes, the Attorney General or any district attorney, either on his own initiative or at the instance of another person, may file before the Supreme Court of Puerto Rico a petition for an information in the nature of *Quo Warranto* in the name of The People of Puerto Rico; and if from the allegations such court shall be satisfied that there is probable ground for the proceeding, the court may grant the petition and order the information accordingly. Where it appears to the court that the several rights of divers parties to the same office or franchise may properly be determined on the same proceeding, the court may give leave to join all such persons in the same petition, in order to try their respective rights to such office or franchise.'

" 'When any corporation by itself or through any other subsidiary or affiliated entity or agent is unlawfully holding, under any title, real estate in Puerto Rico, The People of Puerto Rico may, at its option, through the same proceedings, institute in its behalf the confiscation of such property, or the alienation thereof at public auction, within a term of not more than six months counting from the date on which final sentence is rendered.

" 'In every case, alienation or confiscation shall be through the corresponding indemnity as established in the law of eminent domain.'

"Section 2.—Section 6 of an Act entitled 'An Act establishing *Quo Warranto* proceedings,' approved March 1, 1902, is hereby amended as follows:

" '6.— * * * * * * *

" 'Whenever, in the opinion of the court, it is satisfactorily established that the corporation or corporations have performed acts or exercised rights not conferred by law, or in violation of the express

provisions thereof, the judgment entered shall, in case the defendant is a domestic corporation, decree the dissolution thereof and the prohibition to continue doing business in the country; and in the case of a foreign corporation, the nullity of all acts done and contracts made by the defendant corporation or entity; and in addition, said judgment shall decree the cancellation of every entry or registration made by the said corporations in the public registries of Puerto Rico; and when the decreee of nullity affects real property and The People of Puerto Rico has chosen to confiscate it' or orders it sold at public auction, the final judgment shall fix the reasonable price to be paid for said property. For these purposes, the just value of the property subject to alienation or confiscation shall be fixed in the same manner as it is fixed in cases of condemnation proceedings.' '' (Laws of 1935, Special Session, page 530.)

The defendant has insisted through these proceedings that Joint Resolution No. 23 of May 1st, 1900, is void because it contains an arbitrary discrimination against agricultural corporations; that the Legislative Assembly of Puerto Rico has no power to confer to this Supreme Court original exclusive jurisdiction in *quo warranto* proceedings based on a violation of the laws limiting the amount of land that may be held by corporations, such jurisdiction corresponding exclusively to the Federal Court of Puerto Rico; and that the complaint does not state facts sufficient to constitute a cause of action against the defendant corporation. A further discussion of said questions is unnecessary. The same questions were raised, fully discussed, and decided against the defendant corporations in *People* v. *Fajardo Sugar Co.* (*Quo Warranto* No. 1), 50 P.R.R. 157, and 51 P.R.R. 867.

Had we had any doubts as to the power of the Legislature of Puerto Rico to pass Acts Nos. 33, 44, and 47, *supra,* the said doubts would have been dispelled by the unanimous decision rendered by the Supreme Court of the United States in the case of *Puerto Rico* v. *Shell Co.,* 302 U. S. 253, 260, in which the question involved was the validity of the local anti-trust act, which by its section 3 confers jurisdiction upon the district courts of the Island in respect of violations of

that act. It was claimed by the defendant company that the Sherman Anti-trust Act of 1890, supplemented by the Clayton Act of 1914, covered the entire field embraced by the local anti-trust act, and the latter, therefore, was void; and that section 4 of the Sherman Act confers jurisdiction upon the several district courts of the United States. In upholding the validity of the local statute, the Supreme Court, through Mr. Justice Sutherland, said:

"1. Section 14 of the Foraker Act, passed April 12, 1900, c. 191, 31 Stat. 77, 50, provided that the statutory laws of the United States, not locally inapplicable should have the same force and effect in Puerto Rico as in the United States, with certain exceptions not material here. Section 27 (P. 82) provided 'That all local legislative powers hereby granted shall be vested in a legislative assembly. . . .' And by sec. 32 (pp. 83–84), it was provided that the legislative authority 'shall extend to all matters of a legislative character not locally inapplicable. . .' These various provisions are continued in force by secs. 9, 25 and 37 of the Organic Act of March 2, 1917, c. 145, 39 Stat. 951. These provisions do not differ in substance from the various provisions relating to the powers of the organized and incorporated continental territories of the United States, in respect of which this court said in *Clinton* v. *Englebrecht*, 13 Well. 434, 441, that the theory upon which these territories have been organized 'has ever been that of leaving to the inhabitants all the powers of self-government consistent with the supremacy and supervision of National authority, and with certain fundamental principles established by Congress'; and in *Hornbuckle* v. *Toombs*, 18 Wall. 648, 655, 656, we said: 'The powers thus exercised by the Territorial legislatures are nearly as extensive as those exercised by any State Legislature.' See also *Cope* v. *Cope*, 137 U. S. 682, 684, where this court, speaking of this typical general provision contained in the Utah Organic Act, said that, with the exceptions noted in the provision itself, 'the power of the Territorial legislature was apparently as plenary as that of the legislature of a State.' In *Maynard* v. *Hill*, 125 U. S. 190, 204, the essential similarity of the various provisions in respect of the powers of territorial legislatures was pointed out, and it was said that what were 'rightful subjects of legislation' was to be determined 'by an examination of the subjects upon which legislatures had been in the practice of acting with the consent and approval of the people they represented.'

"The grant of legislative power in respect of local matters, contained in sec. 32 of the Foraker Act and continued in force by sec. 37 of the Organic Act of 1917, is as broad and comprehensive as language could make it. The primary question posed by the challenge to the validity of the act under consideration is whether the matter covered by the act is one 'of a legislative character not locally inapplicable.' It requires no argument to demonstrate that a conspiracy in restraint of trade within the borders of Puerto Rico is clearly a local matter, and that it falls within the precise terms of the power granted by secs. 32 and 37 of the respective acts in which the grant is found. The power being given without express limitation, a conclusion that the present exercise of the power is precluded by the existence of sec. 3 of the Sherman Act must rest upon the assumption that a congressional statute penalizing specific local behavior and a statute of Puerto Rico to the same effect cannot coexist. With due regard to the status of the territory, the character of its established government, the positive terms of the congressional grant of power, and the lack of conflct between the two acts, that assumption must be rejected.

"2. The aim of the Foraker Act and the Organic Act was to give Puerto Rico full power of local self-determination, with an autonomy similar to that of the states and incorporated territories. *Gromer* v. *Standard Dredging Co.*, 224 U. S. 362, 370; *Porto Rico* v. *Rosaly y Castillo, supra,* p. 274. The effect was to confer upon the territory many of the attributes of *quasi*-sovereignty possessed by the states— as, for example, immunity from suit without their consent. *Porto Rico* v. *Rosaly y Castillo, supra.* By those acts, the typical American governmental structure, consisting of the three independent departments—legislative, executive and judicial—was erected. 'A body politic'—a commonwealth—was created. 31 Stat. 79, sec. 7, c. 191. The power of taxation, the power to enact and enforce laws, and other characteristically governmental powers were vested. And so far as local matters are concerned, as we have already shown in respect of the continental territories, legislative powers were conferred nearly, if not quite, as extensive as those exercised by the state legislatures.

"This comprehensive grant of legislative power made by Congress plainly recognizes the great desirability of devolving upon the local government the responsibility of searching out local offenses and prosecuting them in the local tribunals. The insular Supreme Court in this case declared in emphatic terms the wisdom of such local control in respect of the matter dealt with by the act in question.

Although striking down, with evident reluctance, the act as invalid, that court said: 'The right of the Insular Legislature and officers to prosecute and punish such monopolies as may be set up within our jurisdiction is really inestimable. It was so understood by our Legislature when it took upon itself to legislate on the subject. This is a wholesome and necessary legislation that should be enforced through the insular courts. It must be admitted that The People of Puerto Rico has a special interest in prosecuting before the courts those citizens who violate its own laws. No matter how interested the National Government may be in prosecuting such offenses, instances might occur where the latter would pass unnoticed by the federal officers, or where, for some reason or other, such officers might not display the same activity and interest that is to be expected from the local officials.' "

It should require no argument to demonstrate that the monopolization of agricultural lands within the borders of Puerto Rico is also a clearly local matter, falling within the precise terms of the powers granted by section 32 of The Foraker Act and section 37 of the Organic Act of March 2, 1917.

The defendant is a corporation authorized to engage in agriculture and expressly restricted by its charter to the ownership and control of not to exceed five hundred acres of land. It has admitted by its pleadings that it owns and controls 12,188 acres of land, the greater part of which are planted to sugar cane. We are convinced that the complainant has made out a case which entitles it to the relief prayed for in its complaint. Our conviction is not shaken in the least by any one of the two specific defenses set up by the defendant.

■ The fact that the defendant corporation is also authorized by its articles of incorporation to engage in the industry of manufacturing sugar cannot operate as a release of said corporation from the restrictions imposed by the Organic Act and by its own articles of incorporation (sec. 4, par. (*f*), *supra*) upon said corporation when the same engages in agriculture. The aims and purposes of the law may not be so easily circumvented and defeated. The upholding of

such defense would make it possible for one corporation, notwithstanding the provisions of the Organic Act and of its own articles of incorporation, to own, control and monopolize all of the sugar lands of Puerto Rico, by simply claiming that it is engaged in the manufacture of sugar, as its principal business, and that it needs all of said lands to plant, cultivate and produce thereon all the cane that it needs for its mill, equipped to produce over one million tons of sugar.

██ Of much less force is the plea that the People of Puerto Rico is estopped from claiming at this time the forfeiture of the defendant's corporate franchise, because of the government's acquiescence and of its delay in requiring compliance with the law. The continuous violation of the prohibitory statute during a number of years cannot be invoked by the violator as the basis or source of its alleged right to continue *ad perpetuam* in the ownership and control of lands in excess of the amount permitted by the statute. The allowance of such pleas would make it possible for the owner of a gambling establishment or bawdy house to claim immunity from prosecution and the right to continue in such illegal business upon proof of its operation for a number of years without interference by the police authorities.

The overwhelming weight of authority is in favor of the proposition that a statute cannot be repealed by nonuser, unless such nonuser is accompanied by the enactment of irreconcilable statutes or the establishment of an opposite legislative policy, or unless circumstances have so changed that the object of the statute has vanished or its reason ceased. 39 Cyc. 1085, par. F; 59 C. J. 928, sec. 532; *Pearson* v. *International Distillery et al.,* 34 N. W. (Iowa) 1, affirmed 128 U. S. 1. In *Gulf Refining Co.* v. *City of Dallas,* 10 S. W. (2d) 151, 158, it was said:

". . . As we understand, the doctrine of 'obsolete law,' as applied in some instances to the common law, has never been recognized as applicable to a legislative enactment and certainly not to a constitutional provision by any of the courts of this country."

In *Interstate Forwarding Co.* v. *Vineyard,* 3 S. W. (2d) 947, 957, the plea of "nonuser" was overruled, the Court of Civil Appeals of Texas using the following language:

". . . In its last analysis, appellant's position is that, if an officer charged with the enforcement of a particular law fails to enforce that law against all persons required to observe the provisions of same, the officer has thereby suspended the law. To this position we cannot assent. The duty rests upon the citizenship to observe the plain mandates of the law as much so as it rests upon an officer charged with the enforcement of its terms and provisions to discharge that duty, and the validity of a statute cannot thus be impaired, but only its enforcement interfered with. In other words, the law remains in full force and effect, although, so to speak, in a state of hibernation, because of nonenforcement. This is in keeping with the following rules of statutory construction:"

The Supreme Court of the United States, in *Chicago, etc. R. R. Co.* v. *Iowa,* 94 U. S. 155, 162, said:

"It is a matter of no importance that the power of regulation now under consideration was not exercised for more than twenty years after this company was organized. A power of government which actually exists is not lost by non-user. A good government never puts forth its extraordinary powers, except under circumstances which require it."

And in *Louisville & N. R. Co.* v. *U. S.,* 282 U. S. 740, 759, the same Court said:

"Long continued practice and the approval of administrative authorities may be persuasive in the interpretation of doubtful provisions of a statute, but cannot alter provisions that are clear and explicit when related to the facts disclosed. *A failure to enforce the law does not change it.* The good faith of the carriers in the transactions of the past may be unquestioned, but that does not justify the continuance of the practice." (Italics ours.)

See *Standard Oil Co.* v. *Fitzgerald,* 86 Fed. (2d) 799; *State* v. *Burr,* 84 So. 61, 74; *State* v. *Meek,* 67 Pac. 76; *State* v. *Nease,* 80 Pac. 897; and *Parker* v. *Board of Dental Examiners,* 14 P. (2d) 67, in which it was held:

". . . Delayed action on the part of those who are charged with the execution of law will not be permitted to annul the law. It may be considered by the court as a reason for the mitigation of punishment, but the judicial department is not absolutely bound to regard it."

It is true that the People of Puerto Rico has not until now taken direct and positive action to enforce the limitations of the Joint Resolution of May 1, 1900. But it is also true that the provisions of said Joint Resolution were reenacted and made a part of the Organic Act of 1917, which action is, in our judgment, a clear expression of the will of Congress to continue in force and to maintain alive the legislative policy providing for a limitation of land tenure by corporations engaged in agriculture in Puerto Rico. Our attention has not been called to the passage, either by Congress or by the local Legislature, of any statute establishing a different or irreconcilable legislative policy. On the contrary, the evident and clear intent and purpose of Acts Nos. 33, 44 and 47 of 1935, *supra,* was to provide the procedural means for the enforcement of the land tenure restrictions. And this Supreme Court in all of its decisions, rendered in administrative appeals against the refusals of registrars to record deeds of purchase in favor of corporations, involving more than 500 acres of land, consistently held that it was not one of the functions of the registrars to pass upon the validity of such acquisitions, while suggesting that the proper remedy should be a direct and positive action by the state against the infringing corporation to test its right to hold such lands in violation of the statute and for the cancellation of its charter.

For the foregoing reasons it is our opinion that judgment should be rendered in favor of the plaintiff and against the defendant herein, with the following pronouncements:

1. Adjudging and decreeing that the defendant corporation Rubert Hermanos, Inc., is engaged in agriculture and is guilty of owning and controlling 12,188 acres of land in violation of the provisions of Joint Resolution No. 23 of

the Congress of the United States (31 Stat. 716, U. S. C. A., title 48, sec. 752), of section 39 of the Organic Act of Puerto Rico and of its own articles of incorporation, by all of which provisions the said defendant corporation is expressly limited and restricted to the ownership and control of lands not in excess of 500 acres.

2. Ordering and decreeing the forfeiture and cancellation of the license of the defendant corporation, of its articles of incorporation and further ordering the immediate dissolution and the winding up of the affairs of said corporation.

3. Imposing on the defendant the payment of all costs and disbursements had in these proceedings, including the sum of two thousand dollars ($2,000.00) for attorneys' fees.

4. Sentencing said defendant to the payment of a fine in the sum of three thousand dollars only, said sum having been fixed taking in consideration the delay on the part of the complainant in instituting these proceedings.

Mr. Justice Wolf is in agreement with many parts of the opinion and with the first pronouncement of the judgment. With respect to some of the other pronouncements, he has some doubts as to the power of the court, which might perhaps be dissipated after a more careful study. He is also doubtful as to whether, even if the court has the power, it should be exercised in the manner in which it has been exercised. He reserves the right to express his opinion more fully.

Mr. Justice De Jesús took no part in the decision of this case.